09-1496-ag
Robinson Knife Mfg. Co. v. Comm'r

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued:  December 16, 2009                    Decided:   March 19, 2010)

Docket No. 09-1496-ag

_____

ROBINSON KNIFE MANUFACTURING COMPANY, INC. AND SUBSIDIARY,

*Petitioner-Appellant*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*[*]

_____

Before: CALABRESI, CABRANES, and PARKER, *Circuit Judges.*

_____

Appeal from a judgment of the United States Tax Court holding that, pursuant to 26 U.S.C. § 263A and the corresponding Treasury regulations, Petitioner-Appellant could not immediately deduct its sales-based trademark royalty payments, but was instead required to capitalize such costs.  We REVERSE the decision below.

ROBERT J. LANE, JR., Hodgson Russ LLP, Buffalo, N.Y., *for Petitioner-Appellant.*

_____

[*] The Clerk of the Court is directed to amend the official caption as set forth above.

1

JOHN A. DUDECK, JR. (Richard Farber, *on the brief*) for John A. DiCicco, Acting Assistant Attorney General, Tax Division, U.S. Department of Justice, Washington, D.C., *for Respondent-Appellee.*

_____

CALABRESI, *Circuit Judge*:

Petitioner-Appellant Robinson Knife Manufacturing Company ("Robinson") sells kitchen tools labeled with trademarks licensed from third parties to whom Robinson pays royalties. In Robinson's income tax returns for its taxable years ending March 1, 2003, and February 28, 2004, Robinson deducted these royalty payments as ordinary and necessary business expenses under 26 U.S.C. § 162. The Commissioner disagreed and issued a notice of deficiency stating that, under 26 U.S.C. § 263A, the royalties are required to be capitalized and made part of Robinson's inventory costs. The Tax Court, T.C. Memo 2009-9, 2009 Tax Ct. Memo LEXIS 10, upheld the Commissioner. Robinson appeals. We hold that where, as here, a producer's royalty payments (1) are calculated as a percentage of sales revenue from inventory and (2) are incurred only upon the sale of that inventory, they are immediately deductible as a matter of law because they are not "properly allocable to property produced" within the meaning of 26 C.F.R. § 1.263A-1(e). We therefore REVERSE the decision below.

**Facts**

**I.  Robinson Knife**

Robinson is a corporation whose business is the design, manufacture and marketing of kitchen tools such as spoons, soup ladles, spatulas, potato peelers, and cooking thermometers. In the process by which Robinson typically turns an idea into a saleable finished product, someone

2

at Robinson comes up with an idea for a product. Robinson then decides which brand name would be best for that product, and if Robinson does not already have a licensing agreement that would permit it to use that trademark on the proposed product, it tries to negotiate one. Once Robinson has a licensing agreement in hand, it hires an industrial designer to design the product, and the trademark licensor is consulted "to make sure that they agree that [the designer's plans] are appropriate for the brand that's involved." Robinson next contracts out the manufacturing, usually to firms in China or Taiwan, and the products are shipped to Robinson in the United States. With the products in hand, Robinson markets them under the previously selected brand name to customers, who are generally large retailers such as Wal-Mart or Target.

Robinson's products are functionally the same as its competitors', so it largely relies on trademarks and design to differentiate its products. One particular subset of those trademarks is at issue here: famous trademarks licensed by Robinson from third parties who own the trademarks.[1] Often Robinson makes and sells, at the same time, products that are identical, but only some of which bear the relevant trademarks, while others do not. Robinson does not advertise the Robinson name or feature it prominently on its products' packaging.

During the taxable years at issue, Robinson used, *inter alia*, two well-known licensed trademarks: Pyrex, which is owned by Corning, Inc., and Oneida, which is owned by Oneida Ltd. The owners of these two trademarks have for many years conducted substantial and continuous advertising and marketing activities to develop trademark awareness and goodwill. As a result, it is much easier for Robinson to place a Pyrex or Oneida product at a major retailer than it is to place an otherwise identical house-brand product.

---

[1] Robinson also makes and sells some products labeled with "house" trademarks owned by Robinson, as well as store-brand products for sale to particular retail store chains that own these store brands.

3

In all respects relevant to this case, the Pyrex and Oneida licensing agreements were the same. The agreements gave Robinson the exclusive right to manufacture, distribute, and sell certain types of kitchen tools using the licensed brand names. In return, Robinson agreed to pay each trademark owner a percentage of the net wholesale billing price of the kitchen tools sold under that owner's trademark.[2] Robinson was not required to make any minimum or lump-sum royalty payment, nor did royalties for any kitchen tools accrue at any time before the tools were sold. Thus, Robinson could design and manufacture as many Pyrex or Oneida kitchen tools as it wanted without paying any royalties unless and until Robinson actually sold the products.[3] Robinson did sell a significant volume of Pyrex- and Oneida-branded products, and during the taxable years at issue it paid royalties both to Corning and to Oneida, of $2,184,252 and $1,741,415, respectively.

**II.     The Tax Controversy**

On Robinson's Forms 1120, U.S. Corporation Income Tax Return, for taxable years ending March 1, 2003, and February 28, 2004, Robinson deducted the above-mentioned payments to Corning and Oneida as ordinary and necessary business expenses under 26 U.S.C. § 162. The IRS determined instead that under 26 U.S.C. § 263A and the accompanying Treasury Regulations the royalty payments, rather than being immediately deductible, must be added to Robinson's capital and deducted only over time, in line with complex accounting principles. As

---

[2] The percentage in the Pyrex agreement was 8%. The Oneida agreement provided that Robinson would pay 11% on net sales up to $1 million, and then 8% on net sales above $1 million. A later Oneida agreement changed the 8% to 9% before the end of the taxable period at issue.

[3] Robinson also agreed to contractual provisions designed to protect the value of the licensed trademarks, as is typical in trademark licensing agreements. Before selling a branded product, Robinson had to get the trademark owner's approval of the product's design, its packaging, and any promotional materials. Robinson further agreed not to engage in conduct that would damage the goodwill or value of the licensed trademarks.

a result, the IRS denied the deduction and issued a notice of deficiency to Robinson.

Robinson petitioned the Tax Court for a redetermination of the deficiency. Robinson there argued, as it does here, that the royalty payments were not required to be capitalized under the § 263A regulations. The Tax Court rejected Robinson's arguments. It held that, within the meaning of the Treasury Regulations, the royalties directly benefited Robinson's production activities and/or were incurred by reason of those activities. It also held that the royalties were not "marketing" costs exempt from § 263A capitalization under those regulations. Robinson timely appealed to this Court.

**Discussion**

**I.      Standard of Review**

We review the Tax Court's legal conclusions *de novo* and its factual findings for clear error. *Wright v. Comm'r*, 571 F.3d 215, 219 (2d Cir. 2009). The parties dispute the standard of review applicable to mixed questions of law and fact decided by the Tax Court. The Commissioner notes that we have thrice held that clear error review applies to such Tax Court decisions. *Id.*; *Merrill Lynch & Co. v. Comm'r*, 386 F.3d 464, 469 (2d Cir. 2004); *Bausch & Lomb Inc. v. Comm'r*, 933 F.2d 1084, 1088 (2d Cir. 1991). Yet Robinson points out that we apply *de novo* review to mixed questions decided by a district court after a bench trial. *See, e.g.*, *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 300 (2d Cir. 2006); *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 199 (2d Cir. 2003). And the relevant statute commands us to review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). We need not resolve this apparent

5

inconsistency here. In our view, the case presents a pure question of law—the interpretation of a Treasury Regulation—and we therefore apply *de novo* review.[4]

**II.      Legal Framework**

**A.      Capitalization and Deduction**

The income tax law distinguishes between business expenses and capital expenditures. Under 26 U.S.C. § 162(a), taxpayers may deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." By contrast, under 26 U.S.C. § 263(a)(1), no immediate deduction is allowed for capital expenditures, which are "[a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." As the Supreme Court has explained in the leading case on this distinction, immediate deduction of a cost is more favorable to the taxpayer than is capitalization:

> The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise.

*INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 83-84 (1992).

The significance of the distinction is only slightly different where, as here, the expense would be capitalized to inventory. For inventory—especially inventory held for sale—the taxpayer usually does not have to rely on depreciation or wait for dissolution of the enterprise in order to obtain cost recovery. Instead, the taxpayer has to follow complex inventory accounting rules in order to get deductions over time. *See* 26 C.F.R. § 1.263A-1(c)(4) ("Costs that are

---

[4] We note, however, that *Wright*, *Merrill Lynch*, and *Bausch & Lomb* do not cite the above-mentioned statute, and their application of clear error review to mixed questions does appear to be in tension with the statute's text.

6

capitalized under section 263A are recovered through depreciation, amortization, cost of goods sold, or by an adjustment to basis at the time the property is used, sold, placed in service, or otherwise disposed of by the taxpayer.").  These rules are designed to achieve a result that is as similar as possible to what would happen if it were administratively feasible to keep track of each individual inventory item, so that whenever an item were sold its cost basis would be known, and the taxpayer would pay income tax on the gain (or deduct the loss) from the sale of that inventory item.  In other words, "costs of merchandise and produced goods are capitalized and held in abeyance until they can be matched against sales revenues."  Bittker & Lokken, Federal Taxation of Income, Estates and Gifts ¶ 105.8.1 (2009); *see also* 26 U.S.C. § 471(a) (giving the Secretary authority to prescribe inventory accounting rules to "clearly reflect[] . . . income"); *INDOPCO*, 503 U.S. at 84 ("[T]he Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes.").

With ideal matching, a taxpayer would be permitted to deduct the costs of producing an inventory item no earlier, and no later, than the taxable year in which that particular inventory item is sold.  Unfortunately, when a company has, say, 100,000 identical spatulas on hand at any given time and it is constantly creating and selling such spatulas (along with any number of other products), perfect matching may be difficult and the costs of producing an inventory item are sometimes recovered earlier or later than they ought to be.  A distortion of income results.

**B.     Section 263A**

As part of the most recent major revisions to the Internal Revenue Code, Congress, in the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, enacted 26 U.S.C. § 263A to address what it perceived as two significant problems concerning the expense/capital expenditure

7

boundary with respect to inventory:

> First, the existing rules may allow costs that are in reality costs of producing, acquiring, or carrying property to be deducted currently, rather than capitalized into the basis of the property and recovered when the property is sold or as it is used by the taxpayer. This produces a mismatching of expenses and the related income and an unwarranted deferral of taxes. Second, different capitalization rules may apply under present law depending on the nature of the property and its intended use. These differences may create distortions in the allocation of economic resources and the manner in which certain economic activity is organized. . . . [I]n order to more accurately reflect income and make the income tax system more neutral, a single, comprehensive set of rules should govern the capitalization of costs of producing, acquiring, and holding property . . . .

S. Rep. No. 99-313, at 140 (1986), *reprinted in* 1986-3 C.B. (Vol. 3) 1, 140; *see also Suzy's Zoo v. Comm'r*, 273 F.3d 875, 879 (9th Cir. 2001) ("The legislative history of § 263A indicates that Congress intended a single comprehensive set of rules to govern determination of whether costs should be capitalized, from the moment of acquisition through production and disposition of property.").

The statute provides that, in the case of "[r]eal or tangible personal property produced by the taxpayer," 26 U.S.C. § 263A(b)(1), both "the direct costs of such property, and . . . such property's proper share of those indirect costs (including taxes) part or all of which are allocable to such property," *id.* § 263A(a)(2), shall be included in inventory costs if it is inventory in the hands of the taxpayer, *id.* § 263A(a)(1)(A). Where, as here, a taxpayer does not manufacture kitchen tools itself, but instead contracts the manufacturing out, it still "produces" the kitchen tools within the statutory definition of that term. *Id.* § 263A(g)(2).

**C. The § 263A Regulations**

Treasury is authorized to make regulations to carry out the purposes of § 263A. *Id.* § 263A(i). And, several years after the statute's enactment, Treasury issued final § 263A regulations, T.D. 8482, 1993-2 C.B. 77. The preamble to the 1993 final regulations contains an

8

explanation of the purpose of § 263A and of the regulations that is substantially identical to the statement found in the legislative history. *See id.* at 78.[5] Two parts of these uniform capitalization regulations are central in this case. The first is the determination of whether a particular cost must be capitalized; the second explains how, once a cost is capitalized, it is allocated to particular units of inventory.

### 1. Whether To Capitalize

Under the regulations, "[t]axpayers subject to section 263A must capitalize all direct costs and certain indirect costs properly allocable to property produced . . . ." 26 C.F.R. § 1.263A-1(e)(1). Direct costs consist primarily of materials and labor, *id.* § 1.263A-1(e)(2), and the Commissioner does not claim that Robinson's royalty payments are direct costs. As to indirect costs, the regulation states the following:

> Indirect costs are defined as all costs other than direct material costs and direct labor costs (in the case of property produced) . . . . Taxpayers subject to section 263A must capitalize all indirect costs properly allocable to property produced . . . . Indirect costs are properly allocable to property produced . . . when the costs directly benefit or are incurred by reason of the performance of production . . . activities. Indirect costs may be allocable to . . . other activities that are not subject to section 263A. Taxpayers subject to section 263A must make a reasonable allocation of indirect costs between production . . . and other activities.

*Id.* § 1.263A-1(e)(3)(i).

Paragraphs (ii) and (iii) contain lists of "[e]xamples of indirect costs required to be capitalized," and "[i]ndirect costs not capitalized," respectively. *Id.* § 1.263A-1(e)(3). Paragraph (ii) states that the items on its list "are examples of indirect costs that must be capitalized to the extent they are properly allocable to property produced." *Id.* § 1.263A-1(e)(3)(ii). One of the items on the list is:

---

[5] The preamble to the original 1987 temporary regulations does the same. *See* T.D. 8131, 1987-1 C.B. 98, 98-99.

(U) Licensing and franchise costs. Licensing and franchise costs include fees incurred in securing the contractual right to use a trademark, corporate plan, manufacturing procedure, special recipe, or other similar right associated with property produced . . . . These costs include the otherwise deductible portion (e.g., amortization) of the initial fees incurred to obtain the license or franchise and any minimum annual payments and royalties that are incurred by a licensee or a franchisee.

*Id.* § 1.263A-1(e)(3)(ii)(U). Conversely, paragraph (iii) states that the items on its list "are not required to be capitalized under section 263A." *Id.* § 1.263A-1(e)(3)(iii). The first item on that list is: "(A) Selling and distribution costs. These costs are marketing, selling, advertising, and distribution costs." *Id.* § 1.263A-1(e)(3)(iii)(A).

### 2. How To Allocate

Although the dispute in this case is about whether Robinson's royalties must be capitalized and not about how they must be allocated, some discussion of the relevant allocation methods is necessary to an understanding of why the parties care whether Robinson's royalties are deducted or capitalized. The regulations provide for two methods of allocating costs to inventory. The first is the "facts and circumstances" method, *see* 26 C.F.R. § 1.263A-1(f), which most taxpayers use. This method acknowledges that it is often impossible to tell the cost of a particular item sold, and so it uses one of several complicated and administratively expensive processes to approximate that cost and allocate it to particular goods. *See id.*; *see also* Leslie J. Schneider, Federal Income Taxation of Inventories § 5.01[1], [6][d] (2010) (noting that the various forms of the facts-and-circumstances method are expensive to administer because they differ from financial accounting rules and the pre-§ 263A rules).

The other method, the "simplified production method," was created to help manufacturers who, in 1986, would have had to make substantial modifications to their cost accounting methods in order to comply with the new § 263A. *See* W. Eugene Seago, Inventory

Tax Accounting and Uniform Capitalization § 2:47 (2009). Such companies were given the option of grandfathering themselves out of the facts and circumstances method and thereby avoiding the associated administrative costs. The simplified production method, using a ratio found in the regulations, allocates a pool of costs between ending inventory and cost of goods sold. *See* 26 C.F.R. § 1.263A-2(b). The simplified production method is administratively cheaper than the facts and circumstances method, but it may result in distortions of income unfavorable to the taxpayer because it can force the taxpayer to allocate costs to ending (*i.e.*, ongoing) inventory when a more accurate method would have permitted much quicker cost recovery by allocating most or all of those same costs to inventory that was sold.[6] Robinson elected the simplified production method.

If the allocation methods in the regulations worked perfectly, this case would never have been litigated. Under a perfect allocation system, every cent Robinson paid in sales-based royalties would be allocated to exactly those inventory items whose sale triggered Robinson's

---

[6] As one treatise explains:

> Although the simplified production method does reduce the difficulty and expense that otherwise would result from determining inventoriable costs under Section 263A, it is not clear whether a taxpayer actually benefits by employing the simplified procedure. It is clear that accounting costs are reduced, but application of the method may result in an increase in the amount of inventoriable costs as compared to what the increase would be under a more precise computation. Because the increase to ending inventory is based on the ratio of additional Section 263A costs incurred during the year to Section 471 costs incurred during that year, for some businesses a significant portion of the additional Section 263A costs would not be associated with goods in ending inventory if precise computations were made. For example, additional Section 263A costs incurred during the year may be 10 percent of total Section 471 costs incurred during the year. Yet, the nature of the additional Section 263A costs may be attributable to producing only a very small portion of items actually in ending inventory. Thus, these additional costs might have only a slight impact on ending inventory under a precise computation. However, under the simplified production method, 10 percent of these additional Section 263A costs will be allocated to ending inventory.

Stephen F. Gertzman, Federal Tax Accounting ¶ 6.07[4][a] (2009).

obligation to pay. Because it is the sale of kitchen tools that triggers Robinson's obligation to pay royalties, all Robinson's royalties would be allocated to those inventory items that are sold, at the same time as, and therefore during the same taxable year as, the royalties are incurred. The result would be that Robinson would recover the cost of the royalties immediately—just as it would if, as Robinson claims, the royalties were deductible rather than subject to capitalization.

In reality, the allocation methods do not work perfectly. And Robinson, presumably to save administrative costs, elected the least accurate of the permissible methods. A significant amount of money, therefore, rides on whether Robinson can deduct its royalty payments. If Robinson cannot deduct the payments immediately, then a substantial portion of them will be allocated to ending inventory, and Robinson will have to wait until a later taxable year to recover those costs.

**III.    Deductibility of the Royalty Payments**

Robinson presents three arguments that the royalty payments are not required to be capitalized under § 263A: (1) that the royalty payments are deductible as "marketing, selling, advertising, [or] distribution costs," 26 C.F.R. § 1.263A-1(e)(3)(iii)(A); (2) that royalty payments which are not "incurred in securing the contractual right to use a trademark, corporate plan, manufacturing procedure, special recipe, or other similar right associated with property produced," *id.* § 1.263A-1(e)(3)(ii)(U), are always deductible; and (3) that the royalty payments were not "properly allocable to property produced," *id.* § 1.263A-1(e)(3)(i).[7] All of these arguments present questions of first impression. We are the first court of appeals to address the treatment of intellectual property royalties under the uniform capitalization regulations. Apart from the decision below, the only other case concerning these issues is another Tax Court

---

[7] Notably, Robinson does not challenge the validity of the applicable Treasury regulations. Robinson only disputes the Commissioner's and the Tax Court's interpretations of them.

memorandum decision. *See Plastic Eng'g & Tech. Servs., Inc. v. Comm'r*, T.C. Memo. 2001-324, 2001 Tax Ct. Memo LEXIS 360.

We reject Robinson's first two arguments as addressing situations that go far beyond the case presented here, but we are persuaded that the third argument is correct. We conclude that royalty payments which are (1) calculated as a percentage of sales revenue from certain inventory, and (2) incurred only upon sale of such inventory, are not required to be capitalized under the § 263A regulations.

**A.      Marketing, Selling, Advertising, and Distribution Costs**

According to Robinson, its royalty payments are "marketing, selling, advertising, [or] distribution costs." Although Robinson is correct that "marketing, selling, advertising, and distribution costs" are deductible, 26 C.F.R. § 1.263A-1(e)(3)(iii)(A), we are not persuaded by Robinson's two arguments that all trademark royalty payments are such costs.

First, Robinson emphasizes that its object in licensing the trademarks is to entice customers to buy products that are otherwise identical to Robinson's competitors' products. But Robinson's argument proves too much. All trademarks may serve that purpose. And the regulations specifically list "fees incurred in securing the contractual right to use a *trademark*," *id.* § 1.263A-1(e)(3)(ii)(U) (emphasis added), as an "example[] of indirect costs that must be capitalized to the extent they are properly allocable to property produced or property acquired for resale," *id.* § 1.263A-1(e)(3)(ii). If we were to accept Robinson's view, we would effectively read the word "trademark" out of the relevant regulation.

Second, Robinson argues that Rev. Rul. 2000-4, 2000-1 C.B. 331, compels the conclusion that trademark royalties are "marketing, selling, advertising, and distribution costs." This Court has not decided on the proper level of deference owed to revenue rulings after *United*

13

*States v. Mead Corp.*, 533 U.S. 218 (2001). *See Reimels v. Comm'r*, 436 F.3d 344, 347 n.2 (2d Cir. 2006). We need not do so here, for the ruling does not help Robinson no matter how much deference we accord to it. In the revenue ruling, a taxpayer was permitted to deduct the costs of obtaining ISO 9000 certification, which differentiated it from non-certified competitors and allowed it to do businesses with customers who required certification. The IRS determined that ISO 9000 certification, like advertising or training expenses, "does not result in future benefits that are more than incidental." Rev. Rul. 2000-4, 2000-1 C.B. at 331. But, in contrast to trademarks, there is nothing in the 26 C.F.R. § 1.263A-1(e)(3)(ii) list that suggests that fees for certifications such as ISO 9000 must ever be capitalized. Since trademarks instead are on the capitalization list, the revenue ruling is wholly distinguishable.

Moreover, Robinson's argument is at odds with the intent of both § 263A and the regulations. If all trademark royalties were "marketing, selling, advertising, [or] distribution costs," then they would be deductible regardless of the terms of the contracts under which they were paid. As a result, a lump-sum minimum royalty payment (*i.e.*, a royalty payment of a specified amount which does not vary regardless of the number of trademarked items manufactured or sold) would be immediately deductible. So would a manufacturing-based royalty paid whenever the manufacturer produced an inventory item bearing the licensed trademark—and this would be so even if the trademarked items were not sold until a later taxable year. But the point of § 263A and its regulations is precisely to make sure that trademark royalties are not deducted during a taxable year which precedes the year in which the corresponding trademarked items are sold. To hold otherwise would be to "allow costs that are in reality costs of producing, acquiring, or carrying property to be deducted currently, rather than capitalized into the basis of the property and recovered when the property is sold or as it is used

14

by the taxpayer. This [would] produce[] a mismatching of expenses and the related income and an unwarranted deferral of taxes." S. Rep. No. 99-313, at 140; *accord* T.D. 8482, 1993-2 C.B. at 78. For these reasons, we reject the contention that *all* trademark royalties are immediately deductible.

## B. Incurred in Securing the Contractual Right

Robinson next argues that its royalty payments are deductible because they are not described in § 1.263A-1(e)(3)(ii)(U), that is, because they are not "incurred in securing the contractual right to use a trademark, corporate plan, manufacturing procedure, special recipe, or other similar right associated with property produced." But Robinson's conclusion does not follow from its premise. Assuming arguendo that Robinson's royalty payments are not described in § 1.263A-1(e)(3)(ii)(U), that "description" does not include all costs, or even all trademark costs, that must be capitalized. The costs incurred by Robinson are still indirect costs, and they are, therefore, required to be capitalized to the extent they are properly allocable to property produced. As § 1.263A-1(e)(3)(i) explains, "[i]ndirect costs are defined as *all costs* other than direct material costs and direct labor costs (in the case of property produced)." (emphasis added). The royalties are costs. They are not direct costs. Hence, they are indirect costs, and such costs are not exempt from the capitalization requirement merely because they are absent from the list of "examples of indirect costs that must be capitalized to the extent they are properly allocable to property produced" found in § 1.263A-1(e)(3)(ii).

Robinson's second argument, like its first, moreover, is too broad. According to Robinson, the above-cited language in § 1.263A-1(e)(3)(ii)(U) requires capitalization only of lump-sum minimum royalties. Assuming, contrary to what we have said above, that costs not described in subclause (U) are necessarily deductible, then any manufacturing-based royalty

15

would be deductible. But it would be contrary to the purpose of § 263A to permit taxpayers to manufacture inventory and deduct royalties immediately, even if that inventory were not sold or otherwise disposed of until a later taxable year.

### C. Properly Allocable to Property Produced

Robinson's third argument is that the Tax Court's view that Robinson's royalties were "properly allocable to property produced" was based on an erroneous interpretation of 26 C.F.R. § 1.263A-1(e)(3)(i). We agree.

The Tax Court stated:

> The Corning and Oneida license agreements gave petitioner the right to manufacture the Pyrex- and Oneida-branded kitchen tools, and without the license agreements, petitioner could not have legally manufactured them. In addition to securing the licenses for the trademarks, obtaining approval from the licensors to use the Pyrex and Oneida trademarks on new kitchen tools was also an integral part of developing and producing the Pyrex- and Oneida-branded kitchen tools. For example, the industrial designers that petitioner hired conferred with the licensors to ensure that the new kitchen tools were appropriate for a particular trademark. After the new kitchen tools were manufactured, Corning and Oneida had the right to inspect and approve the finished kitchen tools before petitioner marketed and sold them to customers. We conclude that acquiring the right to use the Pyrex and Oneida trademarks was part of petitioner's production process. Consequently, the royalties paid to Corning and Oneida directly benefited petitioner's production activities and/or were incurred by reason of petitioner's producing the Pyrex- and Oneida-branded kitchen tools and are therefore indirect costs properly allocable to the Pyrex- and Oneida-branded kitchen tools petitioner produced.

*Robinson*, 2009 Tax Ct. Memo LEXIS 10, at *16-*17.

But, as Robinson points out, the Tax Court's reasoning confuses the *license agreements* with the *royalty costs*. The Treasury regulations provide that "[i]ndirect costs are properly allocable to property produced . . . when the *costs* directly benefit or are incurred by reason of the performance of production . . . activities." 26 C.F.R. § 1.263A-1(e)(3)(i) (emphasis added). The Tax Court did not ask whether the *royalty costs* "directly benefit[ed] or [were] incurred by

16

reason of the performance of production . . . activities." Instead, the Tax Court asked whether the *license agreements* did so. But that is not what the regulation's language (and sensible intent) goes to.

Royalties like Robinson's in this case do not "directly benefit," and are not "incurred by reason of[,] the performance of production . . . activities." The Tax Court is clearly right that "without the license agreements, petitioner could not have legally manufactured" the Pyrex and Oneida kitchen tools, *Robinson*, 2009 Tax Ct. Memo LEXIS 10, at *16. It is equally clear, however, that Robinson could have manufactured the products, and did, without paying the royalty *costs*. None of the product approval terms of the license agreements referenced by the Tax Court relates to Robinson's obligation to pay the royalty costs. Robinson could have manufactured exactly the same quantity and type of kitchen tools—that is, it could have "perform[ed]" its "production . . . activities" in exactly the same way it did—and, so long as none of this inventory was ever *sold* bearing the licensed trademarks, Robinson would have owed no royalties whatever. Robinson's royalties, therefore, were not "incurred by reason of" production activities, and did not "directly benefit" such activities. In other words, while we may agree with the Tax Court's implicit conclusion that "directly benefit or are incurred by reason of" boils down to a but-for causation test, we hold that under the plain text of the regulation it is the costs, and not the contracts pursuant to which those costs are paid, that must be a but-for cause of the taxpayer's production activities in order for the costs to be properly allocable to those activities and subject to the capitalization requirement.

Our interpretation of § 1.263A-1(e)(3)(i) is corroborated by the regulatory and legislative history, as well as by a related regulation. 26 C.F.R. § 1.263A-2(a)(2)(ii)(A)(1), a regulation that distinguishes between tangible personal property (for which production costs must be

17

capitalized) and intangible property (to which § 263A generally does not apply) states: "[T]he costs of producing and developing books include prepublication expenditures incurred by publishers, including payments made to authors (*other than commissions for sales of books that have already taken place*), as well as costs incurred by publishers in writing, editing, compiling, illustrating, designing, and developing the books." *Id.* (emphasis added).[8] As a result, if a publishing company enters into an agreement with an author whereby royalties (or some portion thereof) are paid for each copy of the book that is sold, and are not due to the author unless and until such sales occur, those royalties are not to be capitalized. By contrast, if the author is paid a royalty for every book that is printed, or receives a lump-sum royalty, then capitalization is required.

It would be contrary to the purpose of § 263A and the regulations if commissions for sales of books that have already taken place were treated differently from similar royalties for sales of other types of goods. The position taken by the Tax Court and the Commissioner in this case would give rise to exactly the problem Congress crafted § 263A to fix, for then "the treatment of indirect costs [would] vary depending on the type of property produced." S. Rep. No. 99-313, at 133. The preamble to the uniform capitalization regulations confirms that capitalization ought not to "depend[] on the nature of the underlying property and its intended use," as it did under the pre-§ 263A laws. T.D. 8482, 1993-2 C.B. at 78. And, the uniform capitalization rules would not be very uniform if they were to treat books and spatulas differently.

---

[8] As discussed below, the regulatory history explains that "commissions for sales of books that have already taken place" refers to commissions for books that, having already been sold, do not remain on hand for future sale.

Moreover, the Treasury's reasoning in adding the parenthetical about "commissions for sales of books that have already taken place" to the final version of 26 C.F.R. § 1.263A-2(a)(2)(ii)(A)(1) is also applicable here. The parenthetical was absent from the temporary regulations, but in a 1988 Notice the IRS stated the following:

> Section 1.263A-1T(a)(5)(iii) of the regulations requires the prepublication expenditures of books publishers (and publishers of similar properties) to be capitalized under section 263A. Under the regulations, prepublication expenditures include payments made to authors of literary works.
>
> Commentators have inquired as to whether this requirement to capitalize payments made to authors would apply to commissions or royalties that were paid to authors where such commissions were based on contemporaneous sales of the books. Commentators have noted that it would be inappropriate for a publisher to capitalize commissions where such commissions related only to books that had been sold by the publishers, and not to any books (or copyrights pertaining to such books) that were still on hand.
>
> In response to these comments, forthcoming regulations will not require the capitalization of payments made to authors where such payments are commissions for sales of books that have already taken place. If, in contrast, payments are made to authors as pre-paid commissions for future sales of books, such payments shall be capitalized and deducted by the publisher as such future sales occur. Moreover, payments made to authors of literary works that pertain to the use, by the publisher, of the author's rights in the literary works, and that are not based on particular sales of the books, shall be capitalized and amortized as prepublication expenditures under section 167 of the Code. In determining whether payments made to authors are described in the preceding sentence, the substance of the transaction, and not its form, shall control.

I.R.S. Notice 88-86, 1988-2 C.B. 401, 409. It would similarly be "inappropriate" for a kitchen-tool manufacturer to capitalize trademark royalties where such royalties are based only on those kitchen tools that have been sold by the manufacturer, and not on any kitchen tools that are still on hand.

Although the 1988 Notice does not explicitly state the reason why capitalization should not be required for "commissions for sales of books that have already taken place," the distinction drawn by the IRS is guided by the principles underlying inventory accounting. The

19

purpose of inventory accounting is—as we have previously said—to reflect income clearly, by matching income with the costs of producing that income in the same taxable year. *See* Part II.A, *supra*. When a publisher incurs the obligation to pay a commission only for books that have already been sold, or when Robinson incurs the obligation to pay a royalty only for kitchen tools that have already been sold, it is necessarily true that the royalty costs and the income from sale of the inventory items are incurred simultaneously.[9] The Commissioner's position in the case before us would, instead, distort Robinson's income by denying it deductions until some subsequent year, potentially long after the inventory items to which those deductions should attach have been sold.

Had Robinson's licensing agreements provided for non-sales-based royalties, such as manufacturing-based or minimum royalties, then under the reasoning of Notice 88-86 capitalization would be required. And this, too, follows from inventory accounting principles. Suppose SpoonCo, another kitchen tool manufacturer, has a licensing agreement with Corning under which royalties are paid for each Pyrex spoon *manufactured*. SpoonCo makes 500 Pyrex spoons in Year 1, and pays Corning a royalty for all 500, as is required by their agreement. SpoonCo doesn't sell any of the spoons until Year 2, when it sells all 500. SpoonCo should have to wait until Year 2 to take the deduction, because otherwise SpoonCo would be getting its deduction in the year before it got the corresponding income.

---

[9] Since Robinson is an accrual-method taxpayer, the "all events" test found elsewhere in the Treasury regulations prohibits Robinson from deducting (or capitalizing) its royalty payments before the corresponding kitchen tools are sold. *See* 26 C.F.R. § 1.461-1(a)(2)(i) ("Under an accrual method of accounting, a liability . . . is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability."). Taxpayers are generally required to use the accrual method for inventory. *See* 26 U.S.C. § 471; 26 C.F.R. § 1.471-1.

20

In the instant case, however, the record is clear that Robinson's royalties were sales-based. They were calculated as a percentage of net sales of kitchen tools, and they were incurred only upon the sale of those kitchen tools.[10] They are therefore immediately deductible.[11]

---

[10] The language of Notice 88-86 reflects a justified concern about the possibility of abuse. We agree with the IRS that "the substance of the transaction, and not its form, shall control," 1988-2 C.B. at 409, in determining whether royalty payments are deductible. The two requirements we have set forth—that the royalties must be calculated based on sales, and that the royalties must be incurred only upon those sales—should prevent most abusive deductions in this context. For example, "payments . . . made to authors as pre-paid commissions for future sales of books," *id.*, would be incurred before the sales took place. Similarly, if a manufacturer entered an agreement whereby no royalties were to be paid unless at least one unit of licensed-trademark inventory were sold, but the amount of royalties would then be a specified lump sum, this agreement would fail the requirement that the royalties be calculated based on sales. We do not, however, rule out the possibility that, in a future case, a taxpayer might structure a licensing transaction in such a way that it formally meets our two requirements, while in economic substance the royalties are for inventory items that have not yet been sold. Under those circumstances, deduction should not be permitted. But there is no suggestion that *Robinson's* royalty payments are, in economic substance, anything other than true sales-based royalties.

[11] One might consider whether some level of deference ought to be given to the Commissioner's interpretation of the Treasury's own regulations. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation" (internal quotation marks omitted)); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (same). But we need not decide whether *Auer* deference applies here or in tax cases generally, for at least two reasons. First, the Commissioner has not argued *Auer* deference, so any such argument is forfeited. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). Second, and more important, even if we were to apply *Auer*, we would not reach a different result. The Commissioner's reading of the regulation is contrary to the plain meaning of its text. In this respect, we note that the Commissioner's brief is not the only agency interpretation of the regulation before us; we also have the preamble, the related regulation concerning copyright royalties paid by book publishers, and Notice 88-86. Thus, unlike *Auer*, there are abundant "reason[s] to suspect that the interpretation [in the agency's brief] does not reflect the agency's fair and considered judgment on the matter in question," 519 U.S. at 462. *Cf. Pierre v. Comm'r*, 133 T.C. ___, ___ , 2009 U.S. Tax Ct. LEXIS 21, at *34-*36 (2009) (Cohen, J., concurring) (similarly rejecting *Auer* deference to the Commissioner's litigating position).

The Treasury has for the past two-and-one-half years indicated that it intends to issue "[g]uidance under § 263A regarding the treatment of post-production costs, such as sales-based royalties." *See* I.R.S. 2009-2010 Priority Guidance Plan (Nov. 24, 2009); I.R.S. 2008-2009 Priority Guidance Plan (Sept. 10, 2008); I.R.S. 2007-2008 Priority Guidance Plan (Aug. 13, 2007). Because we are interpreting the § 263A regulations and not § 263A itself, the Treasury remains free to issue guidance contrary to our holding in the form of new regulations or of amendments to existing regulations. Such regulations would, of course, be subject to judicial

**IV.    Conclusion**

For these reasons, we hold that taxpayers subject to 26 U.S.C. § 263A may deduct royalty payments that are (1) calculated as a percentage of sales revenue from certain inventory, and (2) incurred only upon sale of such inventory.  Accordingly, we REVERSE the judgment of the Tax Court and REMAND with instructions to enter judgment for Robinson.

---

review to determine whether they conform to the underlying statute.  *Cf. Gen. Elec. Co. v. Comm'r*, 245 F.3d 149, 154 n.8 (2d Cir. 2001) (noting that the appropriate deference standard for Treasury Regulations is "arguably unsettled" in this Circuit).  In any event, under the regulations as they now stand, sales-based royalties are deductible provided that they satisfy the requirements set forth in this opinion.