Diebold Foundation, Inc. v. Commissioner of Internal Revenue

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: April 15, 2013                    Decided: November 14, 2013)

Docket No. 12-3225-cv

_____

DIEBOLD FOUNDATION, INC., TRANSFEREE,

*Petitioner-Appellee*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellant*.

_____

Before: POOLER, DRONEY, *Circuit Judges*, SEIBEL,* *District Judge*.

The Commissioner of Internal Revenue ("Commissioner") appeals the decision of

the Tax Court (Goeke, *J.*) holding that the Diebold Foundation, Inc. ("Diebold"), could

not be held liable as a transferee of a transferee under 26 U.S.C. § 6901.  As an initial

matter, we conclude that, as required by 26 U.S.C. § 7482, the standard of review for

mixed questions of law and fact in a case on review from the Tax Court is the same as

_____

* The Honorable Cathy Seibel, United States District Court for the Southern
District of New York, sitting by designation.

that for a case on review after a bench trial from the district court: de novo to the extent that the alleged error is in the misunderstanding of a legal standard and clear error to the extent the alleged error is in a factual determination. On the merits, we hold that the two requirements of 26 U.S.C. § 6901 are separate and independent inquiries, a procedural one governed by federal law and a substantive one governed by state law. Under the New York Uniform Fraudulent Conveyance Act, the applicable state statute, the series of transactions collapses based upon the constructive knowledge of the parties involved. The case is remanded to the Tax Court to determine in the first instance whether Diebold is a transferee of a transferee under § 6901 and whether the three-year or six-year statute of limitations is applicable.

        Vacated and remanded.

_____

ARTHUR T. CATTERALL, Attorney (Kathryn Keneally, Assistant Attorney General, Tamara W. Ashford, Deputy Assistant Attorney General, Gilbert S. Rothenberg, Kenneth L. Greene, Attorneys), Tax Division, United States Department of Justice, Washington, DC, *for Respondent-Appellant*.

A. DUANE WEBBER (Phillip J. Taylor, Summer M. Austin, Mireille R. Zuckerman, Baker & McKenzie LLP, Washington, DC, Jaclyn Pampel, Baker & McKenzie LLP, Chicago, IL, *on the brief*), Baker & McKenzie LLP, Washington, DC, *for Petitioner-Appellee*.

POOLER, *Circuit Judge*:

The Commissioner of Internal Revenue ("Commissioner") appeals the decision of the United States Tax Court (Joseph Robert Goeke, *J.*) holding that the Diebold Foundation, Inc. ("Diebold"), could not be held liable as a transferee of a transferee under 26 U.S.C. § 6901. As an initial matter, we conclude that the standard of review for mixed questions of law and fact in a case on review from the Tax Court is the same as that for a case on review after a bench trial from the district court: de novo to the extent that the alleged error is in the misunderstanding of a legal standard and clear error to the extent the alleged error is in a factual determination. *See* 26 U.S.C. § 7482(a). On the merits, we hold that the two requirements of 26 U.S.C. § 6901—transferee status and liability—are separate and independent inquiries, one procedural and governed by federal law, and the other substantive and governed by state law. We further hold that, under the New York Uniform Fraudulent Conveyance Act, the applicable state statute, the series of transactions at issue collapse based upon the constructive knowledge of the parties involved. The case is remanded to the Tax Court to determine in the first instance whether Diebold is a transferee of a transferee under § 6901 and whether the three-year statute of limitations of 26 U.S.C. § 6901(c)(2), which applies transferee of transferee liability, or the six-year statute of limitations of 26 U.S.C. § 6501(e)(1)(A), which applies to collection when substantial omissions are made from the report of gross income, governs. We thus vacate the decision of the Tax Court and remand the case for further proceedings consistent with this opinion.

3

## BACKGROUND

## I.

This case involves shareholders who owned stock in a C Corporation ("C Corp"), which in turn held appreciated property. Upon the disposition of appreciated property, taxpayers generally owe tax on the property's built-in gain—that is, the difference between the amount realized from the disposition of the property and its adjusted basis. 26 U.S.C. §§ 1(h), 1001, 1221, 1222. A C Corp, a corporation governed by subchapter C of the Internal Revenue Code, *Eisenberg v. Comm'r*, 155 F.3d 50, 52 n.3 (2d Cir. 1998), is treated as a separate legal entity for tax purposes, 26 U.S.C. § 11. C Corps are also subject to tax on built-in gain. *See* 26 U.S.C. §§ 11, 1201.

When shareholders who own stock in a C Corp that in turn holds appreciated property wish to dispose of the C Corp, they can do so through one of two transactions: an asset sale or a stock sale. In an asset sale, the shareholders cause the C Corp to sell the appreciated property (triggering the built-in gain tax), and then distribute the remaining proceeds to the shareholders.[1] In a stock sale, the shareholders sell the C Corp stock to a third party. The C Corp continues to own the appreciated assets and the built-in gain tax is not triggered. In other words, in an asset sale, because C Corps are treated as separate legal entities for tax purposes, subject to corporate tax (independent of any capital gain taxes assessed against the earning shareholders), a C Corp's sale of its assets imposes an

---

[1] *See* 26 U.S.C. §§ 302(a), 331, 1001.

4

additional tax liability. While the C Corp, and not the shareholders, pays this tax liability, such payment nonetheless reduces the amount of cash available for distribution to those shareholders.

In the case of a stock sale, the assets remain owned by the C Corp and the tax on the built-in gain is not triggered. Buyers would generally prefer to purchase the assets directly and receive a new basis equal to the purchase price, thus eliminating the built-in gain. Sellers generally disfavor the sale of assets because of the attendant tax liability and would prefer to sell the stock and move the tax liability on to the purchaser. However, the seller's preferred transaction merely pushes the tax liability down the line; at any point when the shareholders of the C Corp—including new owners who purchased the shares in a stock sale—wish to sell the assets, the built-in gain tax will be triggered. Because of this accompanying tax liability, a stock sale will generally merit a lower sale price than an asset sale.

"Midco transactions" or "intermediary transactions" are structured to allow the parties to have it both ways: letting the seller engage in a stock sale and the buyer engage in an asset purchase. In such a transaction, the selling shareholders sell their C Corp stock to an intermediary entity (or "Midco") at a purchase price that does not discount for the built-in gain tax liability, as a stock sale to the ultimate purchaser would. The Midco then sells the assets of the C Corp to the buyer, who gets a purchase price basis in the assets. The Midco keeps the difference between the asset sale price and the stock purchase price as its fee. The Midco's willingness to allow both buyer and seller to avoid

the tax consequences inherent in holding appreciated assets in a C Corp is based on a claimed tax-exempt status or supposed tax attributes, such as losses, that allow it to absorb the built-in gain tax liability. *See* I.R.S. Notice 2001-16, 2001-1 C.B. 730. If these tax attributes of the Midco prove to be artificial, then the tax liability created by the built-in gain on the sold assets still needs to be paid. In many instances, the Midco is a newly formed entity created for the sole purpose of facilitating such a transaction, without other income or assets and thus likely to be judgment-proof. The IRS must then seek payment from the other parties involved in the transaction in order to satisfy the tax liability the transaction was created to avoid.

## II.

Double D Ranch, Inc., ("Double D"), a personal holding company, taxed as a C Corp, 26 U.S.C. § 542, had two shareholders: the Dorothy R. Diebold Marital Trust ("Marital Trust") and The Diebold Foundation Inc. ("Diebold New York") (together, the "Shareholders"). The trustees of the Marital Trust were the Bessemer Trust Company N.A. ("Bessemer"), operating primarily through its Senior Vice President, Austin J. Power, Jr., Dorothy Diebold ("Mrs. Diebold"), and Andrew W. Bisset, Mrs. Diebold's attorney and personal advisor. The directors of Diebold New York were Mrs. Diebold, Bisset, and the three adult Diebold children. Diebold New York held slightly more than one-third of the shares of Double D;[2] the rest were held by the Marital Trust. Double D

---

[2] On May 28, 1999, the Marital Trust transferred these shares to Diebold New York. Prior to that time, the Marital Trust held all of the shares of Double D.

owned assets worth approximately $319 million, including $21.2 million in cash, $6.3

million in real property, and $291.4 million in publicly traded securities.  Included in

these securities holdings were approximately $129 million in shares of American Home

Products Corporation ("AHP") stock; the rest of the portfolio was made up of diversified

holdings. The AHP stock, other securities, and the real property—a farm in

Connecticut—all had substantial built-in gain, such that the sale of the assets would have

triggered a tax liability of approximately $81 million.

By 1999, Mrs. Diebold and her three children were "anxious" for her to begin

making cash gifts to them, but the Marital Trust was insufficiently liquid for her to make

such gifts.  The other trustees, Power of Bessemer and Bisset, explained to Mrs. Diebold

that the best way to make such gifts would be to sell the shares of Double D.   Power

knew that liquidating the assets of Double D would incur the substantial tax consequences

discussed above because of the low tax basis of the assets.  Power discussed with "a

whole network of people, for months," whether there "were potential purchase[r]s for a

corporation like Double D."  Power engaged senior staff members at Bessemer as well as

lawyers in other trust companies, identifying the illiquidity of the trust and the attendant

tax consequences as "a problem," and asking, "What's the possible solution?  How do we

sell this?"  Among those with whom Power consulted was Richard Leder, an attorney at

Chadbourne & Parke and Bessemer's "principal outside tax counsel."  Identifying the

steep tax liability inherent in the assets held by Double D, Leder testified, "it was

generally known . . . in that profession that there were . . . some people, who for whatever

7

reason, whatever their tax activities are, were able to make very favorable offers to sellers with stock with appreciated assets . . . with the corporation having appreciated assets." Leder directed Power to one of these "people" in the form of Harry Zelnick of River Run Financial Advisors, LLC ("River Run"). Power also sought out Stephen A. Baxley, a managing director at Bessemer, who referred him to Craig Hoffman at Fortrend International LLC ("Fortrend").

The trustees of the Marital Trust and the Directors of Diebold New York each decided that their respective entity would sell all of its Double D stock. Power was primarily responsible for implementing the decision to sell Double D. On May 26, 1999, Power, Baxley, Leder, and two other attorneys, acting as representatives of the Shareholders, met with Zelnick of River Run and Ari Bergmann, a principal at Sentinel Advisors, LLC ("Sentinel"), a small investment banking firm specializing in "structuring economic transactions to solve specific corporate or estate or accounting issues." At this meeting, the Shareholder representatives, Zelnick, and Bergmann discussed methods for valuing Double D's AHP stock and alternatives for dealing with the Connecticut farm property (whether to distribute that asset out of the corporation or to leave it in the corporation for the buyer to sell). They also discussed the possibility of leaving the shareholders with an "option to buy" the farm. Sentinel gave the Shareholders a slideshow presentation of the possibilities for selling and valuing Double D, which

Bergmann subsequently sent to the Shareholder representatives for their reference.[3]

Shortly after this meeting, Dudley Diebold, one of Mrs. Diebold's adult children who was a Director of Diebold New York, founded Toplands Farm, LLC ("Toplands Farm") to purchase the Connecticut farm property from Double-D.

Several days after the meeting with River Run and Sentinel, the Shareholder representatives met with Craig Hoffman and Howard Teig of Fortrend to discuss the sale of Double D. According to Leder, tax attorney to the Bessemer Trust, he was familiar with Fortrend because he "had represented a seller of stock in another transaction where the buyer had arranged to have [Fortrend] participate in the purchase." Fortrend provided Bessemer with a firm profile that detailed its strategy entitled the "Buy Stock/Sell Assets Transaction." Identifying the tax liabilities endemic to selling a corporation with appreciated assets, Fortrend presented its expertise as follows: "We are working with various clients who may be willing to buy the stock from the seller and then cause the

---

[3] As Appellee rightly points out, many of the documents included with the stipulated facts were conceded to be hearsay, and it was agreed that such documents "cannot be admitted for the truth of the matters asserted therein." In seeking to discourage reliance on these materials, Appellee argues they are barred as hearsay based on this stipulation. However, Appellee misapprehends the use to which these documents were put. The IRS, the lower court, and this Court do not rely on these documents to conclude that it is true, for example, that Fortrend actually had clients with "certain tax attributes that enable them to absorb the tax gain inherent in the assets," which would be a use of the documents to prove the truth of the matter asserted. Rather, these documents demonstrated the surrounding circumstances of which the parties were aware. If not offered to prove the truth of the matter, the attendant hearsay rules have no applicability. Fed. R. Evid. 801.

target corporation to sell its net assets to the ultimate buyer. These clients have certain tax attributes that enable them to absorb the tax gain inherent in the assets."

The Shareholder representatives chose to pursue the transaction with Sentinel instead of with Fortrend, and Sentinel sent them an initial term sheet, laying out the preliminary details of the transaction, on June 8, 1999. Sentinel intended to use a newly formed entity, Shap Acquisition Corporation II ("Shap II"), specifically created to carry out the transaction. Power informed the Shareholders that Sentinel would purchase all of the shares of Double D, from both the Marital Trust and from Diebold New York, for a price that "works out to 97% of the market value of the Corporation's assets." Had the Shareholders sold the assets directly, the tax liability would have caused the Shareholders to realize an amount that worked out to approximately 74.5% of the assets' market value, a clear reduction from that negotiated with Shap II. On June 10, 1999, Mrs. Diebold approved of the sale and directed Power to go forward with it. On June 17, 1999, Shap II and the Shareholders executed a letter of intent and term sheet specifying that Shap II would purchase all issued and outstanding Double D Stock for cash in an amount equal to the value of Double D's assets minus a discount of 4.5% of the built-in gain.[4]

---

[4] To state this as a formula:

Purchase Price = Value of Assets - 4.5% Built-In Gain

In a stock sale, one would expect the discount rate to be the amount of the tax liability, which would be the tax rate times the built-in gain. Assuming a flat tax rate of 35%, which was the highest marginal corporate tax rate in 1999, the formula would be:

Purchase Price = Value of Assets - 35% Built-In Gain.

10

Sentinel intended to purchase the Double D stock through Shap II with financing from Rabobank.  Even prior to taking ownership of the Double D stock, Sentinel planned on having Shap II immediately sell Double D's securities portfolio, as it intended to use the proceeds of that sale to repay the loan from Rabobank.  Rabobank provided financing on the condition that Shap II enter into a fixed price contract to sell the securities, with the purchase price to be paid directly to Rabobank, pursuant to an irrevocable payment instruction.  Rabobank understood that the loan would be outstanding for "not more" than five business days, as that was the "longest settlement period" for the securities to be liquidated.  Sentinel determined that the securities would be sold to Morgan Stanley.

While it is not clear that the Shareholders knew the details behind Sentinel's financing plan, the Shareholder representatives did indeed have notice that Shap II planned to sell Double D's securities to Morgan Stanley, based upon the draft of the stock purchase agreement drawn up to execute the stock sale between the Marital Trust and Diebold New York, on the one hand, and Shap II, on the other, which (1) indicated that certain limitations within the agreement would not apply to sale arrangements Shap II already had with Morgan Stanley,  (2) held the selling shareholders liable for any costs incurred upon termination in "connection with arrangements for the sale of the Securities by [Double D] following the Closing,"  and (3) indicated that the agreement's prohibition on assignments of rights would not apply to Shap II assigning its rights "to Morgan Stanley as collateral security for [Shap II's] obligation to deliver the Securities to Morgan Stanley following the closing for purposes of resale."  These specific provisions were

11

altered by the Shareholders' attorneys from Chadbourne to make them far more general and to delete the references to Morgan Stanley. In their review of the purchasing agreement, the Chadbourne lawyers also added further detailed provisions dealing with "Tax Matters." These alterations included changing the responsibility of the selling Shareholders for all taxes "with respect to any tax period ending on or before the Closing Date," to making Shap II, the purchaser, liable for all taxes related to sale of Double D's assets, regardless of the date of the taxable period. The added tax-related provisions also made Shap II liable to the selling Shareholders for related tax refunds and specified that "any sale or other disposition of assets by [Double D] that is consummated after the acquisition of the Shares by [Shap II] shall be treated as occurring after the period ending on the closing date."

After these negotiations, Shap II and the Shareholders executed their stock purchase agreement on June 25, 1999, setting a closing date of July 1, 1999. The agreement also required Shap II to cause Double D to execute an option agreement on the Connecticut farm "immediately" after the closing. This agreement was structured as one between Double D and Toplands Farm, Dudley Diebold's entity, giving Toplands the option to purchase the farm for $6.3 million. Also on June 25, Shap II and Morgan Stanley entered into a contract wherein Shap II agreed to sell the securities held by Double D to Morgan Stanley after the closing date. This agreement mandated the use of the exact same valuation method for the securities as did the agreement between Shap II and the selling Shareholders. The agreement between Morgan Stanley and Shap II was

slated to be executed on July 1, 1999—the same day for which the closing between Shap II and the shareholders was originally scheduled.

On June 30, 1999, Dudley Diebold, acting as manager of Toplands Farm, executed the option agreement to purchase Double D's Connecticut real estate. The agreement, which was to then be executed by Double D "immediately" after the closing, gave Toplands Farm the right to purchase through July 31, 1999. At the same time, Dudley Diebold executed an occupancy agreement that set forth terms allowing Toplands Farm to take possession of the property on July 1, 1999, including requirements that it maintain liability insurance and take responsibility for all utilities and taxes beginning on that date.

The closing between Shap II and Double D was delayed from July 1, 1999, to July 2, 1999. As the closing did not occur as originally scheduled, Shap II could not transfer the securities to Morgan Stanley on July 1, as mandated by the agreement between Shap II and Morgan Stanley. By its terms, Shap II's agreement with Morgan Stanley obligated Shap II to deliver equivalent securities or their cash equivalent to Morgan Stanley in the event the Double D transaction did not occur on July 1, 1999. As it turned out, however, Morgan Stanley did not require this from Shap II. Power contacted Tim Morris, the head of Bessemer's investment department, who contacted John Mack, a very senior officer at Morgan Stanley. Following Morris's call to Mack, Morgan Stanley "backed off" from demanding securities or their cash equivalent from Shap II. Shap II and Double D then closed, a day delayed from the originally set date. Morgan Stanley "backed off" by agreeing to change its settlement date with Shap II to July 6, 1999, the first business day

13

after the July 2, 1999 closing date. Thus, the two agreements—one between Double D and Shap II and the other between Shap II and Morgan Stanley—were both amended to change their closing dates and the date on which the price for all non-AHP shares would be set from July 1 to July 2, while keeping the average pricing mechanism for the AHP shares the same as it had been in the original agreements.

On July 2, 1999, both parties to the stock sale of Double D took steps to carry out the transaction. The selling Shareholders opened an account at Rabobank for the receipt of Double D's cash holdings. The Marital Trust, Diebold New York, and Bessemer executed an agreement with Rabobank in which the bank agreed to waive any of its possible set-off rights against the account. Under such an agreement, Rabobank could not apply any of the money from that account to satisfy Shap II's obligation to pay its loan to the bank. Also on July 2, in executing the closing, Rabobank credited over $297 million to Shap II's account per the loan agreement, and Shap II paid $297 million to the Shareholders, with further adjustments to be paid shortly thereafter. The Shareholders transferred their stock shares to Shap II, and Bessemer wired Double D's cash holdings from the account at Bessemer to the newly created account at Rabobank.

On the same day, Double D instructed Bank of New York to transfer the securities in Double D's account to Morgan Stanley on July 6, 1999. This was an irrevocable transfer agreement—between Bessemer, Double D, and Shap II—to transfer custody of Double D's assets to Shap II's Morgan Stanley account and "to not honor any other request or instruction which would cause Bessemer to be unable to make such a transfer."

14

Shap II also directed Morgan Stanley to transfer over $258 million into its loan account at Rabobank on July 6 and irrevocably instructed Rabobank to pre-pay its loan obligation with any amounts transferred into that account.

On July 6, 1999, Bessemer and Bank of New York delivered the securities in Double D's accounts to Shap II's Morgan Stanley accounts. As to these transferred securities, which represented approximately 97% of the total value of Double D's securities, Morgan Stanley recorded a trade date of July 2, 1999, and, with the exception of one security, a settlement date of July 6, 1999. Also on July 6, Morgan Stanley wired over $297 million from Shap II's Morgan Stanley account to Shap II's loan account at Rabobank, and Bessemer wired the funds transferred by Shap II pursuant to the closing to the Marital Trust and Diebold New York, in proportion to the amount of stock in Double D each owned. On July 9 and 12, 1999, Shap II paid the Shareholders the additional purchase price adjustments, bringing the total amount paid by Shap II to approximately $309 million. Bessemer distributed these funds to the Marital Trust and Diebold New York on July 12. Bessemer made an additional distribution of $15.7 million to the selling Shareholders on November 8, 1999.

Also pursuant to the closing on July 2, the option agreement regarding the sale of the Connecticut real estate was executed. Toplands Farm paid $1,000 for the option to purchase. Subsequently, Toplands Farm made a down payment to Shap II for the farm on July 28, 1999, and paid the purchase price in full on August 27, 1999.

15

The transaction described above had the form of a Midco transaction with Shap II in the role of the Midco. The Shareholders sold the Double D stock for approximately $309 million in cash. Morgan Stanley and Toplands Farm purchased, respectively, Double D's securities and real property. Shap II received approximately $319 million from the asset sale. Because it claimed losses sufficient to offset the built-in gain, it did not pay any tax on this amount. After paying back its loan to Rabobank, it retained a profit of approximately $10 million.

Pursuant to a dissolution, effective on January 29, 2001, Diebold New York distributed all of its assets in equal shares to three foundations, each one headed by one of the adult Diebold children: the Diebold Foundation ("Diebold"), Appellee in the instant case, the Salus Mundi Foundation, and the Ceres Foundation. These transfers, of approximately $33 million each, were not made in exchange for any property or to satisfy an existing debt. On March 26 and April 15, 2004, Bessemer distributed an additional $5.6 million from the escrow account used for the sale of Double D to the Marital Trust and to each of the successor foundations of Diebold New York.

### III.

The parties to this Midco transaction all filed tax returns. The Shareholders filed timely returns reflecting their sale of Double D stock. Double D filed a corporate return for a short taxable year, beginning July 1, 1999, and ending July 2, 1999, and dissolved. Double D's asset sales were not included in this return. On its tax return for the taxable year ending June 30, 2000, Shap II filed a consolidated return with Double D, on which it

16

reported all of Double D's built-in gain from its asset sales. On this return, Shap II

claimed sufficient losses to offset the gain, resulting in no net tax liability.[5]

On March 10, 2006, the IRS issued a notice of deficiency against Double D,

determining a deficiency of income tax, penalties, and interest of approximately $100

million for its July 2, 1999 taxable year. The deficiency resulted from the IRS's

determination that the Shareholders sale of Double D stock was, in substance, actually an

asset sale followed by a liquidating distribution to the Shareholders. Double D did not

contest this assessment, but the IRS was unable to find any Double D assets from which

to collect the liability.

Deciding that any additional efforts to collect from Double D would be futile, the

Commissioner attempted to collect from the Shareholders as transferees of Double D.

Section 6901 of the Internal Revenue Code authorizes the assessment of liability against

both (a) transferees of a taxpayer who owes income tax and (b) transferees of transferees.

26 U.S.C. § 6901(a)(1)(A)(I), (c)(2). On August 7, 2007, the IRS issued a notice of

transferee liability against Mrs. Diebold as a transferee of Double D. The Tax Court

determined that she was not liable because the Marital Trust was the actual Double D

shareholder, and the court saw no reason to ignore its separate existence. *Diebold v.*

---

[5] The Tax Court concluded that Shap II's losses were artificial losses from a Son-of-BOSS transaction. A Son-of-BOSS transaction is a type of tax shelter that creates artificial tax losses. *See Kligfield Holdings v. Comm'r*, 128 T.C. 192, 194 (2007). The name refers to the fact that the tax shelter "is a variation of a slightly older alleged tax shelter known as BOSS, an acronym for 'bond and options sales strategy.'" *Id.*

*Comm'r*, 100 T.C.M. (CCH) 370, at *8 (2010). On July 11, 2008, the IRS issued separate notices of transferee liability against each Foundation for the approximately $33 million each received from Diebold New York.[6] The Commissioner asserted that Diebold New York was a transferee of Double D and that the three successor Foundations were, in turn, transferees of Diebold New York. The Foundations contested the notices of deficiency before the Tax Court, who consolidated their petitions for briefing and decision. The parties agreed to use the same evidence, including trial testimony, that was used in the earlier *Diebold v. Comm'r*, 100 T.C.M. (CCH) 370 (2010). The Tax Court found in favor of the petitioners, holding in a memorandum opinion that Diebold New York was not liable as a transferee of Double D, and thus that Diebold and the other successor Foundations were not liable as transferees of a transferee. Following its memorandum opinion, the Tax Court entered separate decisions in favor of each Foundation. The IRS now appeals.

## DISCUSSION

### I.

In an appeal from the Tax Court, it is without dispute in this Circuit that we review legal conclusions de novo and findings of fact for clear error. *Robinson Knife Mfg. Co. v. Comm'r*, 600 F.3d 121, 124 (2d Cir. 2010). While we have previously held the standard

---

[6] In that case, as noted by the Tax Court, the IRS failed to raise the argument that Mrs. Diebold was a transferee of a transferee. *Id.* at *10. The IRS chose not to appeal the decision.

of review for mixed questions of law and fact to be one for clear error, *see Wright v. Comm'r*, 571 F.3d 215, 219 (2d Cir. 2009), all Courts of Appeals are to "review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury."  26 U.S.C. § 7482(a)(1).  Our case law enunciating the standard of review for mixed questions of law and fact in an appeal from the Tax Court is in direct tension with this statutory mandate.  Following a civil bench trial, we review a district court's findings of fact for clear error, and its conclusions of law de novo; resolutions of mixed questions of fact and law are reviewed de novo to the extent that the alleged error is based on the misunderstanding of a legal standard, and for clear error to the extent that the alleged error is based on a factual determination. *MacWade v. Kelly*, 460 F.3d 260, 267 (2d Cir. 2006).  Two recent panels of our Court have recognized this contradiction between our case law and 26 U.S.C. § 7482(a)(1) but did not resolve the tension, as they determined that under either standard of review the outcome in the particular case would be the same.  *Scheidelman v. Comm'r*, 682 F.3d 189, 193 (2d Cir. 2012); *Robinson Knife*, 600 F.3d at 124.  In the instant case, the standard of review affects the outcome, so our Court can avoid the question no longer.

The standard that mixed questions of law and fact are reviewed under a clearly erroneous standard when we review a decision of the Tax Court was established in this Circuit's jurisprudence in *Bausch & Lomb Inc. v. Comm'r*, 933 F.2d 1084, 1088 (2d Cir. 1991).  *Bausch & Lomb* imported the standard from the Seventh Circuit, which, in *Eli Lilly & Co. v. Comm'r*, 856 F.2d 855, 861 (7th Cir. 1988), held the clearly erroneous

19

standard to be applicable. *Eli Lilly* in turn relied upon another Seventh Circuit case, *Standard Office Bldg. Corp. v. United States*, 819 F.2d 1371, 1374 (7th Cir. 1987), a tax case on review from the district court. None of these decisions mention 26 U.S.C. § 7482(a)(1), which has been a part of the Internal Revenue Code since 1954. In *Standard Office Building*, the Seventh Circuit indicated that one of the open questions in the appeal was "the kind of 'mixed' question of fact and law . . . that, *in this circuit at least*, is governed by the clearly-erroneous standard." *Id.* (emphasis added). That court then cited a handful of cases from their circuit that stated this standard from cases reviewing the decision of a *district court*. 819 F.2d at 1374 (citing *Mucha v. King*, 792 F.2d 602, 605 (7th Cir. 1986) (review from the Northern District of Illinois noting that "[i]n particular, the Second Circuit had long adhered to the view that [the mixed question of law and fact at issue in the particular case] is not subject to the clearly-erroneous standard") and *Wright v. United States*, 809 F.2d 425, 428 (7th Cir. 1987) (review from the Central District of Illinois)). The Seventh Circuit uses the clearly erroneous standard of review for mixed questions of law and fact when reviewing both decisions of the Tax Court and those of the district courts. Its standard is thus not in tension with 26 U.S.C. § 7482(a)(1), unlike this Court's.

Quoting *Eli Lilly* approvingly, in *Bausch & Lomb*, this Court indicated, "'We are unaware of any decision discussing the standard that governs appellate review of a Tax Court's [determination].'" *Bausch & Lomb*, 933 F.2d at 1088 (quoting *Eli Lilly*, 856 F.2d at 860-61). It was certainly the case that no decision at that time discussed the standard

20

for such appellate review, but the statute which governs our Court's review of Tax Court decisions set out a mandatory standard, tied to the level of review in appeals on review from a district court. 26 U.S.C. § 7482(a)(1). Once imported from the Seventh Circuit, this standard for mixed questions of law and fact, which stands at odds with our standard for such review of district court decisions, was propagated again in *Merrill Lynch & Co. v. Comm'r*, 386 F.3d 464, 469 (2d Cir. 2004) (citing *Bausch & Lomb*, 933 F.2d at 1088), and again in *Wright*, 571 F.3d at 219 (2d Cir. 2009) (citing *Merrill Lynch*, 386 F.3d at 469; *Bausch & Lomb*, 933 F.2d at 1088). These three cases make up the bulk, if not the entirety, of the citations for this standard in subsequent decisions of this Court. *See Wilmington Partners L.P. v. Comm'r*, 495 F. App'x 173, 174 (2d Cir. 2012) (summary order) (citing *Wright*); *Scheidelman*, 682 F.3d at 193-94 (citing *Wright*, *Merrill Lynch*, and *Bausch & Lomb*); *Robinson Knife*, 600 F.3d at 124 (same); *Wright*, 571 F.3d at 219 (citing *Merrill Lynch* and *Bausch & Lomb*).

We now conclude that this standard of review was adopted in error.[7] As all Article III courts, with the exception of the Supreme Court, are solely creatures of statute, *see* U.S. Const. art. III; 28 U.S.C. §§ 1-463, the statute must be determinative in this case.

---

[7] "We readily acknowledge that a panel of our Court is bound by the decisions of prior panels until such time as they are overruled either by an *en banc* panel of our Court or by the Supreme Court, and thus that it would ordinarily be neither appropriate nor possible for us to reverse an existing Circuit precedent." *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 67 (2d Cir. 2009) (internal quotation marks and citation omitted). "In this case, however, we have circulated this opinion to all active members of this Court prior to filing and have received no objection," a process we refer to "as a mini-*en banc*." *Id.* at 67 & n.9.

Moreover, there is no reason to review the Tax Court under a different standard than a district court, as "its relationship to us [is] that of a district court to a court of appeals." *Scheidelman*, 682 F.3d at 193 (internal quotation marks omitted). We hold that the Tax Court's findings of fact are reviewed for clear error, but that mixed questions of law and fact are reviewed de novo, to the extent that the alleged error is in the misunderstanding of a legal standard. *See* 26 U.S.C. § 7482(a)(1); *MacWade*, 460 F.3d at 267. Having clarified the standard of review applicable to decisions of the Tax Court, we now turn to the merits of the instant case.

## II.

Title 26, Section 6901 of the United States Code provides that the IRS may assess tax against the transferee of assets of a taxpayer who owes income tax. 26 U.S.C. § 6901(a)(1)(A)(I). The section provides that the tax liability will "be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred" and allows for the collection of "[t]he liability, at law or in equity, of a transferee of property . . . of a taxpayer." *Id.* A "transferee" includes a "donee, heir, legatee, devisee, [or] distributee." *Id.* § 6901(h).

The Supreme Court has long held that this section "neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes." *Comm'r v. Stern*, 357 U.S. 39, 42 (1958) (discussing the predecessor transferee liability statute under the Internal Revenue Code of 1939, 26 U.S.C. § 311).

22

Although the provision with respect to transferees is not expansive in its terms, the IRS may assess transferee liability under § 6901 against a party only if two distinct prongs are met: (1) the party must be a transferee under § 6901; and (2) the party must be subject to liability at law or in equity. *Rowen v. Comm'r*, 215 F.2d 641, 643 (2d Cir. 1954) (discussing predecessor statute, 26 U.S.C. § 311). Under the first prong of § 6901, we look to federal tax law to determine whether the party in question is a transferee. *Id.* at 644. The second prong, whether the party is liable at law or in equity, is determined by the applicable state law, *Stern*, 357 U.S. at 45, here, the New York Uniform Fraudulent Conveyance Act ("NYUFCA"), N.Y. Debt. & Cred. Law §§ 270-281. Specifically, Section 273 of the NYUFCA establishes liability for a transferee if the transferor (1) makes a conveyance, (2) without fair consideration, (3) that renders the transferor insolvent. *See* N.Y. Debt. & Cred. Law § 273; *United States v. McCombs*, 30 F.3d 310, 323 (2d Cir. 1994). The parties do not dispute the application of this two-pronged test, but contest the relationship between the two prongs and their application to this particular case.

The Commissioner urges that these two prongs are not independent—that a court must first make a determination as to whether the party in question is a transferee, looking to the federal tax law doctrine of "substance over form" to recharacterize the transaction, and that if a court recharacterizes the transaction, when it proceeds to the second prong to make the determination of state law liability, it must assess liability with respect to the recharacterized transaction. Under this formulation, the order in which the two prongs

23

are assessed is critical to the determination of the case. In contrast, Diebold argues that the two prongs of § 6901 are independent: even if the court uses federal law to recharacterize the transaction under the first prong and determines the party in question is a transferee, it must look separately to state law under the second prong to determine whether to recharacterize the transaction when analyzing liability. Under this formulation, if a court has determined that one of the two prongs does not apply to the party at issue—whether they are a transferee or whether they are liable—it need not consider the other prong of § 6901.

The Tax Court accepted Diebold's understanding of the two-prong framework and stated that "[t]he law of the State where the transfer occurred . . . controls the characterization of the transaction." Under the NYUFCA, a party seeking to recharacterize a transaction must show that the transferee had "actual or constructive knowledge of the entire scheme that renders [its] exchange with the debtor fraudulent." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995). Applying *HBE Leasing*, the Tax Court found that the Shareholders did not have actual or constructive knowledge of the entire series of transactions. Therefore, it respected the form of the transaction between the Shareholders and Shap II as a stock sale. According to the Tax Court, because there was no conveyance from Double D to Diebold New York under § 273 of the NYUFCA, Diebold New York was under no liability in law or equity, and thus the successor foundations were not liable as transferees of a transferee. In making this determination, the Tax Court did not address federal law, but concluded that because

24

there was no state law liability, it was immaterial to the outcome of the case if Diebold was a transferee under the terms of § 6901.

**A.**

The First and the Fourth Circuits have both recently addressed the relationship between the transferee prong and the liability prong of § 6901. *See Frank Sawyer Trust of May 1992 v. Comm'r*, 712 F.3d 597, 605 (1st Cir. 2013); *Starnes v. Comm'r*, 680 F.3d 417, 428 (4th Cir. 2012). Both of these circuits concluded that the two prongs of § 6901 are independent and that the Tax Court did not err by only addressing the liability prong. *Frank Sawyer*, 712 F.3d at 605; *Starnes*, 680 F.3d at 428. We now join the First and Fourth Circuits in their interpretations of § 6901.

In *Stern*, the Supreme Court recognized that the predecessor statute to § 6901 "neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes." *Stern*, 357 U.S. at 42. The statute was enacted in order to do away with the procedural differences between collecting taxes from one who was originally liable and from someone who received property from the original tax ower. *Id.* at 43. The procedures in place prior to the enactment of § 6901's predecessor statute depended upon state statutory or case law and "proved unduly cumbersome." *Id.* The statute was not enacted to expand the government's reach as creditor in collecting taxes. Rather, "[t]he Government's substantive rights in this case are precisely those which other creditors would have under [state] law." *Id.* at 47. As such, § 6901 does not place the government in a better position than any other creditor

25

under state law. This symmetry of rights contemplated under the statute must lead to the conclusion that the requirements of § 6901 are indeed independent. If we accepted the Commissioner's argument that state law liability is assessed based upon the transaction as recharacterized by federal tax law, we would be placing the IRS in a substantially different position than "ordinary creditors under state law." *Starnes*, 680 F.3d at 429. Under the interpretation urged by the Commissioner, the IRS would be able to collapse the transaction based upon federal law, thus transforming it into a conveyance under the applicable state statute, while an ordinary creditor would be required to collapse the transaction under state law—which may require, as it does in this case, a different showing—in order to collect from a transferee. This distinction demonstrates that the position urged by the IRS imports federal law into the substantive determination of liability, in contravention of long settled law that § 6901 is only a procedural statute, creating no new liability. *Stern*, 357 U.S. at 42.

In the instant case, if there was not a "conveyance" under the NYUFCA, a determination that is necessarily made under state law, *id.* at 45, then it is of no moment whether or not the selling Shareholders were "transferees" as defined by federal law—namely, 26 U.S.C. § 6901(h). As the First Circuit recently noted in *Frank Sawyer*, "if the Trust was not a 'transferee' of the companies for purposes of Massachusetts fraudulent transfer law, then whether or not it was a 'transferee' for purposes of § 6901 is irrelevant." *Frank Sawyer*, 712 F.3d at 605. The same formulation is true in the instant case: if Diebold New York did not receive a conveyance from Double D for purposes of

26

the NYUFCA, "then whether or not it was a 'transferee' for purposes of § 6901 is irrelevant." *Id.* Having determined that the two prongs of § 6901 are " independent requirements, one procedural and governed by federal law, the other substantive and governed by state law," *Starnes*, 680 F.3d at 427, we now turn to the Tax Court's assessment of liability under New York state law.

**B.**

The NYUFCA defines a "conveyance" as "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." N.Y. Debt. & Cred. Law § 270. It further establishes liability for a transferee if the transferor, without regard to his actual intent, (1) makes a conveyance, (2) without fair consideration, (3) that renders the transferor insolvent. *See* N.Y. Debt. & Cred. Law § 273; *McCombs*, 30 F.3d at 323. If Double D had sold its assets and liquidated the proceeds to its shareholders without retaining sufficient funds to pay the tax liability on the assets' built-in gains, this would be a clear case of a fraudulent conveyance under § 273. However, due to the Midco form of this transaction, Double D did not actually make a conveyance to the Shareholders. If the form of the transaction is respected, § 273 is inapplicable.

"It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the UFCA." *HBE Leasing*, 48 F.3d at 635 (citing *Orr v. Kinderhill Corp.*, 991 F.2d

27

31, 35-36 (2d Cir.1993)). *HBE Leasing* describes a "paradigmatic scheme" under this collapsing doctrine as one in which

> one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing.

*Id.* Such a transaction can be collapsed if two elements are met. "First, in accordance with the foregoing paradigm, the consideration received from the first transferee must be reconveyed by the [party owing the liability] for less than fair consideration or with an actual intent to defraud creditors." *Id.* "Second, . . . the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent." *Id.*[8] Here, it is clear that the first element is met. Though the transaction in the instant case has an additional wrinkle—namely, an additional party who serves as the conduit for the transfers, Shap II—it is still the case that one transferee received Double D's property, another transferee—the Shareholders—received the consideration for these assets, and Double D was left with nothing, neither its assets nor the value of them. Therefore, in order for there to be liability against the selling Shareholders (and their successor entities), the Shareholders "must have actual or constructive knowledge of the entire scheme that renders [the] exchange with [Double D] fraudulent." *Id.*

---

[8] The Commissioner bears the burden of proof with regard to demonstrating that the parties in question had constructive knowledge of the entire scheme. *See HBE Leasing*, 48 F.3d at 636 n.9.

While under an application of § 273 to a single transaction, the intent of the parties is irrelevant, the knowledge and intent of the parties becomes relevant when a court is urged to treat multiple business deals as a single transaction. *Id.* at 635-36; *In re Corcoran*, 246 B.R. 152, 158-59 (E.D.N.Y. 2000) (Raggi, *J.*). Here, the Commissioner urges the Court to consider the sale of Double D stock to Shap II, the sale of Double D assets by Shap II to Morgan Stanley and Toplands Farm, and the distribution of funds to the selling Double D Shareholders as a single transaction such that a conveyance occurred for purposes of § 273. If the transactions are collapsed, they will be treated as though Double D sold all of its assets and made a liquidating distribution to the Shareholders. Under this collapsed transaction, Double D will have transferred all of its assets to the Marital Trust and Diebold New York receiving nothing, much less fair consideration, in exchange.

Therefore, we must now assess whether the Shareholders had actual or constructive knowledge of the entire scheme. The Tax Court concluded they did not. This assessment is a mixed question of law and fact, assessing whether based upon the facts as determined by the Tax Court, the Shareholders had constructive or actual knowledge as a matter of law. Therefore, we review de novo the Tax Court's determination that the Shareholders did not have constructive knowledge, but review for clear error the factual findings that underpin the determination.

Concluding that a party had constructive knowledge does not require a showing that the party had actual knowledge of a scheme; rather, it is sufficient if, based upon the

29

surrounding circumstances, they "should have known" about the entire scheme. *HBE Leasing*, 48 F.3d at 636 (internal quotation marks omitted). Constructive knowledge in this context also includes "inquiry knowledge"—that is, where transferees "were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but . . . failed to make such inquiry." *Id.* As we noted in *HBE Leasing*, "[t]here is some ambiguity as to the precise test for constructive knowledge," *id.* at 636, in that some cases require "the knowledge that ordinary diligence would have elicited," *see United States v. Orozco-Prada*, 636 F. Supp. 1537, 1543 (S.D.N.Y. 1986), *aff'd*, 847 F.2d 836 (table) (2d Cir. 1988), and other cases have required a "more active avoidance of the truth." *HBE Leasing*, 48 F.3d at 636 (citing *Schmitt v. Morgan*, 471 N.Y.S.2d 365, 367 (3d Dep't 1983)). However, even as we acknowledge this ambiguity in New York law, we need not reach the issue of which test to apply, because the facts here demonstrate both a failure of ordinary diligence and active avoidance of the truth.

The facts in this case rested upon a substantial number of stipulated facts and submissions which together evince constructive knowledge under either standard. As correctly recognized by the Tax Court, assessing whether constructive knowledge existed in this case requires examining all of the circumstances to conclude whether inquiry was required. Constructive knowledge can also be found if, based on all of the facts and circumstances, the party "should have known" about the entire fraudulent scheme. *Id.* The Tax Court concluded that the circumstances in this case did not require the

Shareholder representatives "to make further inquiry into the circumstances of the transaction" between Double D and Shap II. We conclude this was error.

The Tax Court did not sufficiently address the totality of the circumstances from all of the facts, which that court had already laid out itself. The constructive knowledge inquiry does not begin, in this instance, solely with the agreement between Shap II and Double D. Rather, it is of great import that the Shareholders recognized the "problem" of the tax liability arising from the built-in gains on the assets held by Double D. The Shareholders specifically sought out parties that could help them avoid the tax liability inherent in a C Corp holding appreciated assets. They viewed slideshow and other presentations from three different firms—River Run, Sentinel, and Fortrend—that purported to deal with such problems. While the Tax Court is correct in noting that IRS Notice 2001-16 was not yet issued at the time of the instant transactions, this is not determinative on the question of constructive knowledge. The parties to this transaction were extremely sophisticated actors, deploying a stable of tax attorneys from two different firms in order to limit their tax liabilities. One of these attorneys testified, identifying the steep tax liability inherent in the assets held by Double D, that "it was generally known . . . in that profession that there were . . . some people, who for whatever reason, whatever their tax activities are, were able to make very favorable offers to sellers with stock with appreciated assets . . . with the corporation having appreciated assets." While not every taxpayer in the country could have been presumed to have knowledge about the existence of such Midco transactions prior to the IRS issuance of Notice 2001-

16, it is plain from the facts found by the Tax Court that these particular actors did. Considering their sophistication, their negotiations with multiple partners to structure the deal, their recognition of the fact that the amount of money they would ultimately receive for an asset or stock sale would be reduced based on the need to pay the C Corp tax liability, and the huge amount of money involved, among other things, it is obvious that the parties knew, or at least should have known but for active avoidance, that the entire scheme was fraudulent and would have left Double D unable to pay its tax liability.

The Shareholder representatives also had a sophisticated understanding of the structure of the entire transaction, a fact that courts consider when determining whether to collapse a transaction and impose liability on an entity. *See HBE Leasing*, 48 F.3d at 635-36 ("The case law has been aptly summarized in the following terms: "In deciding whether to collapse the transaction and impose liability on particular defendants, the courts have looked frequently to the knowledge of the defendants *of the structure of the entire transaction and to whether its components were part of a single scheme*." (quoting *In re Best Products Co.*, 168 B.R. 35, 57-58 (Bankr. S.D.N.Y. 1994))) (emphasis added). The Shareholder representatives plainly knew that Shap II was a brand new entity that was created for the sole purpose of purchasing Double D stock. They further had notice, by means of the draft stock purchase agreement, that Shap II intended to sell Double D's securities to Morgan Stanley, and by means of the option agreement, Shap II intended to sell the Connecticut real estate to Toplands Farm. The Shareholder representatives knew that Morgan Stanley was going to purchase the securities out of Double D immediately

upon closing, and that the specific language referencing Morgan Stanley was stricken at the behest of the Shareholder representatives further suggests that the Shareholders did not want to know, or reveal that they knew, the details of Shap II's plans to immediately sell Double D's assets.

The delay of the original closing date by one day, and the Shareholders' representatives' corresponding intervention between Shap II and Morgan Stanley, make the conclusion of their "active avoidance of the truth" inescapable. By asking Morgan Stanley to "back off" and give Shap II extra time to provide the Double D securities so that the transactions would not be upended, the Shareholders demonstrated not only their knowledge of the structure of the entire transaction, but their understanding that Shap II did not have the assets to meet its obligation to buy equivalent shares on the open market for delivery to Morgan Stanley or pay Morgan Stanley an equivalent sum in cash. This understanding, combined with the Shareholders' knowledge that Shap II had just come into existence for the purposes of the transaction, was more than sufficient to demonstrate an awareness that Shap II was a shell that did not have legitimate offsetting losses or deductions to cancel out the huge built-in gain it would incur upon the sale of the Double D securities.

Taken together, these circumstances should have caused the Shareholder representatives to inquire further into the supposed tax attributes that allegedly would have allowed Shap II to absorb the tax liability of which the Shareholders had intimate knowledge and which indeed was the very reason they structured this deal in the first

33

instance. To conclude that these circumstances did not constitute constructive knowledge would do away with the distinction between actual and constructive knowledge, and, at times, the Tax Court's opinion seems to directly make this mistake. The facts in this case strongly suggest that the parties actually knew that tax liability would be illegitimately avoided, and in any event, as a matter of law, plainly demonstrate that the parties "should have known" that this was a fraudulent scheme, designed to let both buyer of the assets and seller of the stock avoid the tax liability inherent in a C Corp holding appreciated assets and leave the former shell of the corporation, now held by a Midco, without assets to satisfy that liability.

Based on the myriad circumstances discussed above of which they were aware, the Shareholders had a duty to inquire further into the circumstances of the transaction. *HBE Leasing*, 48 F.3d at 636. The term in the stock purchase agreement allocating liability for the taxes to Shap II and Double D is insufficient to relieve the Shareholders of their duty to inquire. This is because the knowledge requirement for collapsing a transaction was designed to "protect[] *innocent* creditors or purchasers for value." *Id.* It was not designed to allow parties to shield themselves, when having knowledge of the scheme, by simply using a stock agreement to disclaim any responsibility. To accept this rule would be to undermine the very concept of constructive knowledge, as it would allow an incantation of assignment of tax liability to magically relieve the parties of their duty to inquire based on all of the circumstances which they were aware. To relieve parties of this duty, when the surrounding circumstances indicate that they should further inquire,

34

would be to bless the willful blindness the constructive knowledge test was designed to root out. Moreover, we note that when entering into a particular transaction for the express purpose of limiting—or altogether avoiding—tax liability, parties are all the more likely to have this duty to inquire. In such cases, the surrounding circumstances always include a deliberate effort to avoid liability, and it would be the very rare case indeed where a purchasing party would assume such liability without an appropriate discount in the sale price.[9] In such scenarios, being aware that this is the case, parties have a duty "to inquire further into the circumstances of the transaction." *Id.*

As we have concluded that the Shareholders' conduct evinces constructive knowledge in this case, we collapse the series of transactions and find that there was a conveyance under the NYUFCA. In collapsing the transactions, we conclude that, in substance, Double D sold its assets and made a liquidating distribution to its Shareholders, which left Double D insolvent—that is, "the present fair salable value of [its] assets [wa]s less than the amount . . . required to pay [its] probable liability on [its] existing debts as they bec[a]me absolute and matured." N.Y. Debt. & Cred. Law § 271. With the liquidating distribution, Double D did not receive anything from the Shareholders in exchange, and thus it is plain that Double D certainly did not receive fair consideration. As such, all three prongs of § 273 have been met: Double D (1) made a

---

[9] We recognize that some tax avoidance strategies are perfectly permissible. Here, we hold only that whether a transaction arose out of a taxpayer's tax-avoidance motive is simply one factor, among many, that may be considered in determining whether that transaction should be collapsed under state law.

35

conveyance, (2) without fair consideration, (3) that rendered Double D insolvent. *See* N.Y. Debt. & Cred. Law § 273; *McCombs*, 30 F.3d at 323. As we have determined that there is state law liability in the instant case, at issue is whether Diebold New York is a transferee under 26 U.S.C. § 6901, and subsequently, whether Diebold, the Appellee here, is a transferee of a transferee under the same statute.

## III.

Because the Tax Court determined that there was no state law liability, it did not consider the other questions determinative to the outcome here. We thus remand to the Tax Court to determine in the first instance: (1) whether Diebold New York is a transferee under 26 U.S.C. § 6901, relying upon the federal law principles that govern the question of transferee status; (2) whether Diebold, the Appellee in the instant case, is a transferee of a transferee—that is, a transferee of Diebold New York; and (3) which statute of limitations—the three-year statute of limitations laid out in 26 U.S.C. § 6901(c)(2), the six-year statute of limitations laid out in 26 U.S.C. § 6501(e)(1)(A), or some other statute of limitations—applies.

## CONCLUSION

For the reasons stated above, the judgment of the Tax Court is hereby VACATED, and the case is REMANDED to the Tax Court for further proceedings consistent with this opinion.

36