**18-2357-ag**
*Keefe v. Commissioner of Internal Revenue*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2019

ARGUED: OCTOBER 22, 2019
DECIDED: JULY 17, 2020

Nos. 18-2357-ag, 18-2594-ag

DAVID KEEFE, CANDACE KEEFE,
*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,
*Respondent-Appellee*.

————

Appeal from the United States Tax Court.

————

Before: KEARSE, WALKER, and LIVINGSTON, *Circuit Judges*.

————

Petitioners David and Candace Keefe appeal from a decision of the United States Tax Court (Marvel, *J.*) concluding that petitioners held Wrentham House, a historic mansion in Newport, Rhode Island, as a capital asset eligible for capital loss deduction rather than as "real property used in [a taxpayer's] trade or business" eligible for ordinary

loss deduction.[1] The tax court concluded that petitioners did not "engage[] in regular and continuous activity in relation to the property,"[2] as required for "use[] in . . . trade or business,"[3] because they never rented the property, did not meaningfully commence any rental activity, did not take any steps required by the declaration of condominium to rent the property, and were not already engaged in any kind of rental trade or business. The tax court also held that petitioners were liable for late-filing additions to tax under section 6651(a)(1) of the Internal Revenue Code,[4] and for accuracy-related penalties under Code § 6662(a).[5,6] We find that the tax court did not err in determining that (i) petitioners held Wrentham House as a capital asset at the time of its sale and were therefore eligible upon its sale to deduct the loss only as a capital loss, and that (ii) petitioners were liable for late-filing additions to tax and accuracy-related penalties. We therefore AFFIRM.

————

JOSEPH A. LIPARI, Roberts & Holland LLP, New York, NY (Vivek Chandrasekhar, *on the brief*), *for Petitioners-Appellants*.

SHERRA WONG, Attorney, Tax Division, Department of Justice (Teresa E. McLaughlin, *on the brief*), *for* Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Washington, D.C., *for Respondent-Appellee.*

---

[1] *See* 26 U.S.C. § 1221(a)(2).

[2] *See Alvary v. United States*, 302 F.2d 790, 796 (2d Cir. 1962).

[3] *See* 26 U.S.C. § 1221(a)(2).

[4] *See id.* § 6651(a)(1).

[5] *See id.* § 6662(a).

[6] Petitioners have not appealed the tax court's holding that certain interest payments at issue must be included in the adjusted basis for Wrentham House. We therefore do not consider that issue.

_____

JOHN M. WALKER, JR., *Circuit Judge*:

Petitioners David and Candace Keefe appeal from a decision of the United States Tax Court (Marvel, *J.*) concluding that petitioners held Wrentham House, a historic mansion in Newport, Rhode Island, as a capital asset eligible for capital loss deduction rather than as "real property used in [a taxpayer's] trade or business" eligible for ordinary loss deduction.[7] The tax court concluded that petitioners did not "engage[] in regular and continuous activity in relation to the property,"[8] as required for "use[] in . . . trade or business,"[9] because they never rented the property, did not meaningfully commence any rental activity, did not take any steps required by the declaration of condominium to rent the property, and were not already engaged in any kind of rental trade or business. The tax court also held that petitioners were liable for late-filing additions to tax under section 6651(a)(1) of the Internal Revenue Code,[10] and for accuracy-related penalties under Code § 6662(a).[11] We find that the tax court did not err in determining that (i) petitioners held Wrentham House as a capital asset at the time of its sale and were therefore eligible upon its sale to deduct the loss only as a capital loss, and that (ii) petitioners were liable for late-filing additions to tax and accuracy-related penalties. We therefore AFFIRM.

---

[7] *See* 26 U.S.C. § 1221(a)(2).
[8] *See Alvary*, 302 F.2d at 796.
[9] *See* 26 U.S.C. § 1221(a)(2).
[10] *See id.* § 6651(a)(1).
[11] *See id.* § 6662(a).

**BACKGROUND**

Petitioners are a married couple who moved to Newport, Rhode Island in 1996. David Keefe is a fertility doctor who was employed full-time during the relevant time period. Candace Keefe has degrees in art history, education and journalism. Neither was ever a licensed architect or contractor, although Candace had a longtime passion for architecture.

In January 2000, petitioners purchased a 14,400-square-foot historic waterfront mansion and property on Ocean Avenue in Newport for $1.35 million, with the intent of restoring it. They did not reside at the property. They financed the purchase through a series of loans, including one from Bank of America. On October 30, 2002, petitioners executed a declaration of condominium dividing the property in two: Wrentham House and Carriage House. Petitioners sold Carriage House for $950,000 and kept Wrentham House. The declaration of condominium required that, in order to rent out Wrentham House, petitioners must notify the owners of Carriage House of any rental plans and must register Wrentham House with the Newport city clerk as either a short-term rental or a guest house.

Having been vacant for decades, Wrentham House was uninhabitable when petitioners purchased it. Petitioners initially estimated that the restoration would cost $2 million, which they financed through loans. Due to unexpected delays, however, including the health problems of certain subcontractors and unforeseen structural problems with the building, petitioners had to secure additional loans to cover increased costs. The construction began in late 2002 and was completed in May 2008. During that time, petitioners contracted with Lila Delman Real Estate to list the house for sale. The house was listed continuously from May 2004 through its ultimate sale in July 2009, except for one week in 2008.

Petitioners learned of state and federal tax credits that could help recover some of the costs of purchasing and restoring Wrentham House. The tax credits carried eligibility criteria: the state tax credit required historically accurate restoration, and the federal tax credit required that the property be rented to tenants for at least five years. In 2006, petitioners applied for the state tax credit, and in 2007 a state commission determined that the restoration had met eligibility criteria up to that point. Petitioners did not seek the federal tax credit.

From the beginning of construction in 2002 through 2004, Mrs. Keefe regularly visited Wrentham House to oversee the progress of the restoration. In 2005, the family moved to Tampa, Florida, but Mrs. Keefe frequently traveled to Newport to continue to oversee the construction and closely managed the progress by phone when she was not there. According to petitioners, she spent sixty to seventy hours per week overseeing the renovation. Petitioners received two temporary certificates of use and occupancy during the restoration, the first in April 2007 and the second in October 2007. They received a final certificate of use and occupancy in June 2008.

In 2006, petitioners met with Laurie Hewitt Burke, a rental agent with Lila Delman Real Estate, to discuss renting Wrentham House. Petitioners expected Wrentham House to produce monthly rental income of $75,000 during the summer and $10,000 during the rest of the year. Burke inspected the house during the renovations, once in 2006 and continuing throughout 2007. Petitioners hoped the construction would be finished by the end of summer 2007.

In 2007, Burke began speaking to clients about renting the house. She did not advertise online because she did not believe she could market the house while the renovations were ongoing. After further delays, petitioners hoped the house would be ready to rent during the summer of 2008. Burke continued to inspect the house and

to discuss prospective rentals with her clients throughout the rest of 2007 and into 2008. Only one client expressed an interest in renting, but he did not enter into any rental agreement or pay a security deposit. After the restoration was finally completed in May 2008, the house was no longer held out for rent, and ultimately it was never rented. At no point did petitioners notify the owners of Carriage House of any rental plans or register the house with the Newport city clerk as either a short-term rental or a guest house, as required by the declaration of condominium in the event of a Wrentham House rental.

In 2008, Bank of America increased petitioners' monthly mortgage payment from $25,000 to $39,000. Petitioners had taken out a second mortgage, which was conditioned on their continued efforts to sell the property. The property value had diminished; it was appraised for $12.5 million in June 2005 but subsequently assessed for $10.7 million in August 2008 and $9.6 million in July 2009. Petitioners made various efforts to sell the property, including continuing the agency agreement with Burke's real estate firm and contacting three auctioneers, although no auction ever took place. Finally, on July 31, 2009, petitioners sold the property for $6.51 million.

Petitioners hired Arthur Yorkes & Co. to prepare their original federal income tax returns for 2004 through 2009. They did not timely file their 2006, 2007 and 2008 tax returns, and they did not pay their federal income tax liabilities for 2004, 2005, 2006 and 2007. Respondent Internal Revenue Service (IRS) issued notices of intent to levy for petitioners' unpaid tax liabilities for each of those years.

Regarding their 2009 tax return, petitioners initially reported to Arthur Yorkes that they were treating the sale of Wrentham House as the sale of a capital asset. After speaking to an estate planner, they decided that the sale should have been treated as a sale of business

property, which would entitle them to an ordinary loss deduction. Petitioners subsequently hired Gabor & Associates to prepare amended tax returns for tax years 2004 through 2009 and their original return for 2010. The amended 2009 return reported the sale of Wrentham House as the sale of a business property which resulted in a net operating loss. By taking the position that the sale of Wrentham House was an ordinary rather than a capital loss, petitioners were able to offset their taxable income for 2009 and reduce their total tax liability to $16. Petitioners also carried the loss back to tax years 2004-2008 and forward to 2010 and thereby reduced their tax liabilities for those years from a total of $746,445 to $89,171.

In May 2014, the IRS sent petitioners a notice of deficiency for tax years 2008 through 2010 that determined tax deficiencies, penalties, and additions to tax. In August 2015, the IRS sent petitioners a notice of deficiency for tax years 2004 through 2007, also determining tax deficiencies, penalties, and additions to tax. Petitioners timely petitioned in tax court for redetermination of both notices of deficiency, based on their claim that the loss sustained by the sale of Wrentham House was a business loss and not a capital loss.

The tax court (Marvel, *J.*) held that, at the time of its sale, Wrentham House was a capital asset under section 1221 of the Internal Revenue Code ("Code"),[12] not a property used in trade or business under section 1231.[13] The loss incurred from the sale of the property was therefore deductible only as a capital loss, subject to the

---

[12] *See* 26 U.S.C. § 1221.

[13] *Keefe v. Commissioner of Internal Revenue*, 115 T.C.M. (CCH) 1113, 2018 WL 1355693 at *6 (T.C. 2018); *see* 26 U.S.C. § 1231(b)(1). Section 1231(b)(1) reads, "[t]he term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 1 year, and real property used in the trade or business, held for more than 1 year, which is not" included in the enumerated exceptions that follow, none of which are relevant to this appeal.

relevant limitations on such a deduction. The tax court determined that although petitioners "devoted a great deal of time, effort and expense to the renovation of Wrentham" and "intended to offer Wrentham House Mansion for rent once the renovation of the property was complete," that activity was insufficient to constitute the "continuous, regular, and substantial" rental-related activity as required for property to be used in a rental trade or business.[14] The tax court reasoned that, not only did petitioners never rent the house, but "rental activity with respect to Wrentham House Mansion never commenced in any meaningful or substantive way."[15] The tax court also held that petitioners were liable for (i) additions to tax under Code § 6651(a)(1) for their failure to timely file their joint federal income tax returns for tax years 2006, 2007 and 2008 and (ii) accuracy-related penalties under Code § 6662(a) for their substantial underpayment for tax years 2004 through 2010.[16] This appeal followed.

## DISCUSSION

Petitioners do not challenge the tax court's findings of fact or articulation of the applicable legal standard. They argue only that, in deciding when real property is "used in [a] trade or business," the tax court misapplied the body of case law interpreting Code §§ 1221(a)(2) and 1231. Specifically, petitioners contend that they used Wrentham House in a rental trade or business despite never having rented it, and that they therefore incurred an ordinary loss, rather than a capital loss, on its sale. Petitioners also challenge the tax court's determinations that they were liable for additions to tax and accuracy-related penalties, which turn on whether the sale of Wrentham House

---

[14] *Keefe*, 115 T.C.M. (CCH) at 1113, 2018 WL 1355693 at *3, *5, *6.

[15] *Id*. at *6.

[16] *Id*. at *7–*10.

was a capital or an ordinary loss. We find no error in the tax court's application of law and therefore affirm.

A.  <u>Petitioners did not hold Wrentham House as property used in a trade or business.</u>

Section 1221(a) of the Code defines a capital asset as "property held by the taxpayer (whether or not connected with his trade or business)."[17] That section enumerates certain exceptions to its definition of capital asset, which include "real property used in [the taxpayer's] trade or business."[18] In other words, real property must be "used in [a] trade or business" to qualify as an exception from capital asset status. Property held "for the production of income, but not used in a trade or business of the taxpayer, is not excluded from the term *capital assets*."[19] Although the term "trade or business" is found throughout the Code,[20] the statute does not define the term.

Real estate rental is considered a "trade or business if the taxpayer-lessor engages in regular and continuous activity in relation to [renting] the property."[21,22] Although we have not identified an

---

[17] 26 U.S.C. § 1221(a); *see Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 215–16 (1988) (describing § 1221(a) and its exclusions). Section 1221(a) reads, "[f]or purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include" the exceptions enumerated in subsections (1) through (8).

[18] *Id.* § 1221(a)(2). That subsection reads, in full, "property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business. . . ."

[19] 26 C.F.R. § 1.1221–1(b) (emphasis in original).

[20] *See, e.g.*, 26 U.S.C. §§ 62(a), 162(a), 864(b), 871(a)(2).

[21] *Alvary v. United States*, 302 F.2d 790, 796 (2d Cir. 1962) (citing *Gilford v. Commissioner*, 201 F.2d 735, 736 (2d Cir. 1953); *Pinchot v. Commissioner*, 113 F.2d 718, 719 (2d Cir. 1940); *Grier v. United States*, 120 F. Supp. 395 (D. Conn. 1954)).

[22] The tax court articulated this standard as "continuous, regular, and substantial," citing to a case from the Northern District of New York not binding on this court.

exhaustive list of factors to be used in this determination, we have considered the following: whether the taxpayer (or an agent) performs maintenance and repairs,[23] whether the taxpayer employs labor to manage the property or provide tenant services,[24] and whether the taxpayer purchases materials, collects rent, and pays

*Keefe*, 115 T.C.M. (CCH) at 1113, 2018 WL 1355693 at *5 (citing *Union National Bank of Troy v. United States*, 195 F. Supp. 382, 384 (N.D.N.Y. 1961)). We have not expressly added "substantial" to the "regular and continuous" standard articulated in *Alvary*. *See* 302 F.2d at 796. Given the tax court's conclusion that petitioners' rental activity "never commenced in any meaningful or substantive way," *Keefe*, 115 T.C.M. (CCH) at 1113, 2018 WL 1355693 at *6, we see no reason to believe that the tax court's analysis would have differed had it employed the standard articulated in *Alvary*. *See* 302 F.2d at 796.

   Furthermore, some Tax Court cases appear to have been decided under the mistaken impression that our Circuit's approach to the real estate rental "trade or business" question in cases involving single taxpayers is uniquely stringent. *See, e.g.*, *Balsamo v. Commissioner*, 54 T.C.M. (CCH) 608 (T.C. 1987). This impression appears to have arisen from *Grier v. United States*, 120 F. Supp. 395 (D. Conn. 1954), *aff'd. per curiam* 218 F.2d 603 (2d Cir. 1955), a case in which the Second Circuit issued a one-sentence affirmation of a district court's analysis of the real estate rental "trade or business" question. Given our Circuit's other opinions in this area, *see, e.g.*, *Alvary v. United States*, 302 F.2d 790, 796 (2d Cir. 1962) (citing *Grier*, 120 F. Supp. at 395, but stating that the inquiry is just whether the taxpayer engages in "regular and continuous activity in relation to the property"), the one-sentence *per curiam* opinion in *Grier* cannot bear the weight that commentators, *see* Gary R. McBride, *Rental Real Estate Trade or Business—the NIIT and Beyond*, 43 Real Est. Tax'n 16, 24–27, and the Tax Court, *see, e.g.*, *Balsamo*, 54 T.C.M. (CCH) at 608, have assigned it. We thus take this opportunity to clarify that our Circuit's approach to the real estate rental "trade or business" question is not controlled by the district court's strict analysis in *Grier*, 120 F. Supp. at 395. Instead, the question is simply whether the rental activity in question was sufficiently regular and continuous as to lead to the conclusion that the taxpayer was engaged in a real estate rental trade or business. *Alvary*, 302 F.2d at 796.

[23] *See Alvary*, 302 F.2d at 796–97. ("Of course the owner may carry on [the requisite regular and continuous] activities through an agent as well as personally."); *Gilford*, 201 F.2d at 735–36 (finding that taxpayer, who owned partial interest in eight residential and commercial rental properties for the purpose of earning rental income, could deduct an ordinary loss on their sale).

[24] *See id.* at 736 (concluding that if taxpayer's activity "was a 'trade or business,' the petitioner was so engaged although she acted only through an agent").

expenses.[25] The tax court also considered petitioners' efforts to rent the property.[26]

Losses resulting from the sale of property that is not a capital asset are considered ordinary losses and are fully deductible.[27] In contrast, capital losses are deductible subject to certain limitations.[28] As relevant here, individual taxpayers may deduct only the lesser of $3,000 or the amount of the loss.[29]

The determination of whether property held by a taxpayer is a capital asset "normally presents an issue primarily of fact, not to be set aside unless clearly erroneous."[30] We review the tax court's rulings of law *de novo*,[31] and we review mixed questions of law and fact *de novo* to the extent that they involve a misunderstanding of a legal

---

[25] *See Pinchot*, 113 F.2d at 719 (observing that taxpayer's management of rental property "consisted of the leasing and renting of the properties when they became idle, collection of rents and payment of operating expenses, taxes, mortgage interest and other necessary obligations") (internal quotation marks omitted).

[26] *Keefe*, 115 T.C.M. (CCH) at 1113, 2018 WL 1355693 at *6.

[27] *See* 26 U.S.C. §§ 65, 165(a). Section 65 reads, "[f]or purposes of this subtitle, the term 'ordinary loss' includes any loss from the sale or exchange of property which is not a capital asset. Any loss from the sale or exchange of property which is treated or considered, under other provisions of this subtitle, as 'ordinary loss' shall be treated as loss from the sale or exchange of property which is not a capital asset." Section 165(a) reads, "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

[28] *See id.* § 165(f) ("Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.").

[29] *Id.* § 1211(b)(1)–(2). That section reads, "[i]n the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) the lower of—(1) $3,000 ($1,500 in the case of a married individual filing a separate return), or (2) the excess of such losses over such gains."

[30] *Marrin v. Commissioner*, 147 F.3d 147, 150 (2d Cir. 1998).

[31] *Follum v. Commissioner*, 128 F.3d 118, 119 (2d Cir. 1997) (per curiam).

standard.[32] The taxpayer bears the burden of proving that he or she is entitled to an ordinary loss deduction.[33]

Applying this framework, we conclude that petitioners did not engage in "regular and continuous" rental activities because, as the tax court explained, they never commenced rental activity in a meaningful or substantive way. They did not advertise Wrentham House online, sign a lease with any potential tenant, furnish the property for rent after it was ready to occupy, comply with the notice and registration steps required by the declaration of condominium to rent the property, or receive any rental payments or security deposits.

Petitioners did take some limited steps toward renting the property by engaging the rental agent, Burke. Burke first visited the house in 2006. Throughout 2007 and into 2008, she discussed prospective rentals with clients, including the one client who expressed interest but ultimately decided not to rent. But these rental efforts occurred only before the house was ready to occupy; Burke never listed the rental online, and the house was not held out for rent at any time after the restoration was complete.

Petitioners' insignificant efforts to rent Wrentham House stand in contrast to their significant efforts to sell it. Petitioners listed the house for sale continuously from 2004 to its ultimate sale in 2009, except for one week in 2008. Petitioners had the house appraised in 2005 and adjusted the list price at least five times, which suggests they were making real efforts to sell the property rather than creating a nominal listing simply because Bank of America required it for petitioners to take out a second mortgage.

Petitioners maintain that, although they never rented Wrentham House, they "commenced their rental activity by

---

[32] *Diebold Found., Inc. v. Commissioner*, 736 F.3d 172, 183 (2d Cir. 2013).

[33] *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *Scheidelman v. Commissioner*, 755 F.3d 148, 154 (2d Cir. 2014).

undertaking years of work and millions of dollars of renovation costs in order to make the property suitable for rental."[34] But the restoration efforts, including Mrs. Keefe's work overseeing it, no more evince intent to improve the property with the goal of renting it than with the goal of selling it, especially given petitioners' lack of other meaningful steps to commence rental activity.

During the restoration, petitioners omitted steps that would have been required to rent the property, including listing it with the city of Newport as a short-term rental or guest house and notifying the owners of Carriage House in writing of their intent to rent the house. And after the one prospective renter decided not to rent, petitioners doubled down on their efforts to sell Wrentham House rather than rent it: they contacted three auctioneers to attempt to sell, rather than listing the rental online or decreasing the rental price to attract more potential renters.

In addition, petitioners' knowledge of the state and federal tax credits does not evince regular and continuous activity to rent the property. The state tax credit did not contain a rental requirement, so the fact that petitioners completed some steps toward obtaining that credit does not constitute any substantial step toward renting the property. Although petitioners were aware of the federal tax credit, which contained a rental requirement, they never sought it.

In further support of their argument, petitioners cite tax court cases in which a "taxpayer failed to carry out a business goal and yet was held to be engaged in a trade or business."[35] Petitioners accurately characterize the law arising from those cases; failure to use the asset as intended does not necessarily preclude a determination that it was used in a trade or business. But the cases are

---

[34] Petitioners-Appellants' br. at 17.
[35] *Id.* at 23.

distinguishable. In the cited cases, the taxpayers were already conducting a trade or business sufficient to support a finding that the asset in question was held for use in that trade or business, despite that the asset had not yet been used itself. Under the circumstances in each of those cases, the tax court concluded that the taxpayer held the asset for use in a trade or business: a major shareholder of an office supply and equipment corporation who incurred a loss from the sale of a building that had never been rented,[36] a radio broadcaster who incurred a loss from the sale of a never-used radio transmitter,[37] and a tobacco company that incurred a loss from the sale of real property before ever implementing the property's planned use.[38]

Here, in contrast, there is no evidence that petitioners were already engaged in any sort of rental trade or business before purchasing and renovating Wrentham House. Petitioners had never previously tried to rent any other property, and they did not meaningfully commence efforts to rent Wrentham House. This court's decision in *Bonsall v. Commissioner* is instructive on this point.[39] There, the taxpayer-owners of a floor-covering business made a section of the business's two buildings available for lease. The business's biggest supplier rented a portion of the available space at less than market value, generating a "minute" portion of the taxpayers' overall business income.[40] We rejected the taxpayers' argument that they were engaged in a rental trade or business because the rental "appeared to be an accommodation to [the] large supplier . . . and thus an adjunct to [the main business], rather than

---

[36] *Drew v. Commissioner*, 31 T.C.M. (CCH) 143, 147, 160–62 (1972).

[37] *Alamo Broadcasting Co., Inc. v. Commissioner*, 15 T.C. 534, 537, 541 (1950).

[38] *Carter-Colton Cigar Co. v. Commissioner*, 9 T.C. 219, 220–21 (1947).

[39] 317 F.2d 61 (2d Cir. 1963).

[40] *Id.* at 64.

indicative of an independent business."[41] Regarding the rest of the space that was made available but never leased, "[n]o [rental] activity appeared beyond a few casual conversations with prospective tenants."[42] Because the actual rental in *Bonsall* was insufficient to constitute an independent rental business, it stands to reason that petitioners here, who had no rental income, would fare no better. Petitioners' "few casual conversations" (through their agent) with prospective tenants, which did not result in rentals, are not enough.

Accordingly, because petitioners did not "engage[] in regular and continuous activity in relation to the property"[43] and did not take steps sufficient to meaningfully commence any such activity, we affirm the finding of the tax court that petitioners held Wrentham House as a capital asset.

B. Petitioners are liable for late-filing additions to tax under section 6651(a)(1).

Petitioners argue that they are not liable for additions to tax imposed by Code § 6651(a)(1) for failure to timely file their tax returns for tax years 2006, 2007 and 2008. When petitioners filed their amended 2009 tax return, they claimed an ordinary loss deduction for the sale of Wrentham House, and, therefore, reported a net operating loss (NOL). Petitioners carried back the NOL to eliminate their tax liability for tax years 2006 through 2008. They maintain that because there is no late filing penalty if, as they claimed, no net amount is due,[44] they are not subject to the additions to tax for late filing. Because, however, petitioners' ordinary loss deduction was incorrect,

---

[41] *Id.*

[42] *Id.*

[43] *Alvary*, 302 F.2d at 796.

[44] *See Patronik-Holder v. Commissioner*, 100 T.C. 347 (1993).

they are not entitled to the carry-back and therefore owe their tax liabilities for tax years 2006 through 2008. They are therefore liable for additions to tax for failure to timely file their tax returns for those years.

C. Petitioners are liable for accuracy-related penalties under section 6662.

Section 6662 of the Code mandates an accuracy-related penalty for an underpayment of tax attributable to, *inter alia*, "any substantial understatement of income tax."[45],[46] An understatement is "substantial" if it exceeds the greater of $5,000 or ten percent of the tax required to be paid.[47] An understatement is reduced by any portion attributable to an item for which "substantial authority" supported the understatement,[48] or for which the taxpayer adequately disclosed the relevant facts affecting the tax treatment of the item in question, and for which there is a reasonable basis for the

---

[45] 26 U.S.C. §§ 6662(a), (b), (b)(2). Subsection (a) reads, "[i]f this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies." Subsection (b) reads, "[t]his section shall apply to the portion of any underpayment which is attributable to 1 or more of the following[]" enumerated causes, which include "(2) [a]ny substantial understatement of income tax."

[46] The tax court concluded that taxpayers were also liable for additions to tax due to "[n]egligence or disregard of rules or regulations" under section 6662(b)(1). *Keefe*, 115 T.C.M. (CCH) at 1113, 2018 WL 1355693 at *8–*9. Because we conclude that taxpayers are liable due to a substantial underpayment under section 6662(b)(2), we need not address the (b)(1) analysis.

[47] 26 U.S.C. § 6662(d)(1)(A).

[48] *Id*. § 6662(d)(2)(B). That section reads, "[t]he amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to—(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment . . . ."

tax treatment claimed by the taxpayer.[49] Because petitioners have not introduced any evidence that they disclosed relevant facts on their tax return or that they had a reasonable basis for the claimed treatment,[50] only the "substantial authority" inquiry is applicable here. Whether "a taxpayer is liable for an accuracy-related penalty is . . . a factual determination reviewed for clear error."[51] Any questions of law are reviewed *de novo*.[52]

Petitioners do not contest that, if the NOL they reported in 2009 was incorrect, the amount of their understatement for tax years 2004 through 2010 was "substantial." They contend, however, that even if the tax court correctly determined that they incurred a capital loss on the sale of Wrentham House, "substantial authority" supported their position and, thus, penalties are inappropriate.[53]

We disagree. Substantial authority exists "only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment."[54] Relevance and persuasiveness are pertinent to substantial authority, but "a case or revenue ruling having some facts in common with the tax treatment at issue is not particularly relevant if the authority is materially distinguishable on its facts."[55] As we have discussed, the

---

[49] *Id*. § 6662(d)(2)(B)(ii). That section reduces the amount of the understatement for "any item if—(I) the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return, and (II) there is a reasonable basis for the tax treatment of such item by the taxpayer."

[50] The tax court found that "petitioners have not introduced any evidence that they disclosed on their return the relevant facts affecting the tax treatment of items in question or that they had a reasonable basis for such treatment." *Keefe*, 115 T.C.M. (CCH) at 1113, 2018 WL 1355693 at *8. Petitioners do not challenge this determination on appeal.

[51] *Curcio v. Commissioner*, 689 F.3d 217, 225 (2d Cir. 2012).

[52] *See Diebold Found.*, 736 F.3d at 183.

[53] Petitioners-Appellants' br. at 28.

[54] 26 C.F.R. § 1.6662-4(d)(3)(i).

[55] *Id*. § 1.6662-4(d)(3)(ii).

authorities petitioners cite to support their claim that the sale of Wrentham House was an ordinary loss are factually distinguishable and therefore not "particularly relevant," much less "substantial." Although a showing of good faith or reasonable cause can relieve a taxpayer of an accuracy-related penalty, petitioners attempted no such showing before the tax court and have not raised this point on appeal. Accordingly, petitioners are liable for the accuracy-related penalties assessed for tax years 2004 through 2010.

## CONCLUSION

For the reasons discussed above, we AFFIRM the judgment of the tax court.